FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 8 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **THASHA A. BOYD,**<br>**1655 Carrie Farm Lane, NW**<br>**Kennesaw, GA 30144**<br>**678-520-8465**<br>laanatassha@aol.com<br><br>     **Plaintiff,**<br><br>    **vs.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**VETERANS AFFAIRS,**<br>**810 Vermont Avenue NW**<br>**Washington, DC 20420;**<br><br>**JAMES M. BYRNE, in his official**<br>**capacity as General Counsel of the**<br>**U.S. Department of Veterans Affairs,**<br>**810 Vermont Avenue NW**<br>**Washington, DC 20420;**<br><br>**TAMMY KENNEDY, in her official**<br>**capacity as Chief Counsel of the**<br>**Southeast – North District of the**<br>**U.S. Department of Veterans Affairs,**<br>**3322 West End Avenue, Suite 509**<br>**Nashville, TN 37203;** | Case No.<br><br>**1:18-CV-4529**<br><br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br>**FROM VIOLATIONS OF:**<br><br>**(1) Fifth and Fourteenth**<br>  **Amendments of the U.S.**<br>  **Constitution; and,**<br>**(2) The American Procedures**<br>  **Act, 5 U.S.C. § 551 et seq., and**<br>  **5 U.S.C. §§ 702, 704, and 706**<br><br>**DEMAND FOR JURY TRIAL** |

MONIQUE WRIGHT HUDSON, in her )
official capacity as an attorney of the )
Office of the General Counsel, )
Southeast District North, of the U.S. )
Department of Veterans Affairs, )
1700 Clairmont Road )
Decatur, GA 30033; )
)
AL BOCCHICCIO, in his official )
capacity as Director, Veterans Benefits )
Administration, Atlanta Regional )
Office, U.S. Department of )
Veterans Affairs, )
1700 Clairmont Road )
Decatur, GA 30033; )
)
PATRICK ZONDERVAN, in his official )
capacity as Assistant Director, Veterans )
Benefits Administration, Atlanta )
Regional Office, U.S. Department of )
Veterans Affairs, )
1700 Clairmont Road )
Decatur, GA 30033; )
)
SHARON KEY, in her official capacity )
as Human Resources lead, Atlanta )
Regional Office, U.S. Department of )
Veterans Affairs, )
1700 Clairmont Road )
Decatur, GA 30033; )
)
UNITED STATES MERIT SYSTEMS )
PROTECTION BOARD, )
1615 M Street NW )
Washington, DC 20419; and, )

**SHARON POMERANZ, in her** )
**Official capacity as Administrative** )
**Judge, Atlanta Regional Office, U.S.** )
**Merit Systems Protection Board,** )
**401 W. Peachtree Street NW, 10th Floor** )
**Atlanta, GA 30308-3519** )
 )
      **Defendants.** )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. Public employees, like Plaintiff Thasha A. Boyd, possess a constitutionally protected property right in their employment – which has been interpreted through the U.S. Supreme Court [and lower courts'] precedent.

2. This suit challenges the U.S. Department of Veterans Affairs' ("VA") termination of Ms. Boyd's employment and the U.S. Merit Systems Protection Board ("Board" or "MSPB") affirmation of the VA's decision.

3. The VA's termination of Ms. Boyd's employment was arbitrary and capricious, in violation of the VA's policies and procedures (including VA Handbook 5021), a violation of the Administrative Procedure Act ("APA"), and a violation Ms. Boyd's constitutional right (under the Fifth and Fourteenth Amendments to the United States Constitution) to due process and equal treatment before deprivation of property, liberty and privacy.

4. The MSPB's affirmation of the VA's termination of Ms. Boyd's

employment was also arbitrary and capricious, a violation of the Administrative Procedure Act ("APA"), and a violation Ms. Boyd's constitutional right (under the Fifth and Fourteenth Amendments to the United States Constitution) to due process and equal treatment before deprivation of property, liberty and privacy.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (a federal question). This action arises under the APA, 5 U.S.C. § 551 et seq.

6.  The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

7.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) for reasons that include the fact that: Both Plaintiff and at least one Defendant reside in this judicial district; Defendant(s) include officer(s) and employee(s) of the United States; and/or, a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## PARTIES

8.  Plaintiff Thasha A. Boyd is a resident of Kennesaw, Georgia for over nine years. Ms. Boyd accepted employment at the VA in September 2016, and was terminated from her employment effective April 24, 2017.

9.  The defendants in this action are:

A.   The United States Department of Veterans Affairs ("VA"), an agency of the United States charged with providing patient care and federal benefits to veterans and their dependents. For purposes of this claim, the VA was Ms. Boyd's employer.

B.   James M. Byrne, General Counsel of the VA. Mr. Byrne is responsible for ensuring the just and faithful execution of laws, regulations, and policies that the Secretary of the VA has responsibility for administering. Mr. Byrne is being sued in his official capacity.

C.   Tammy Kennedy, Chief Counsel, Southeast – North District of the VA. Ms. Kennedy is responsible for the General Counsel's mission/objectives that encompass the geographic area where the events or omissions giving rise to this claim occurred (the VA Atlanta Regional Office). Ms. Kennedy is being sued in her official capacity.

D.   Monique Wright Hudson, Office of General Counsel, Southeast District North, VA Atlanta Regional Office. Ms. Hudson is the attorney directly involved in representing the VA against Ms. Boyd's appeal of her termination to the MSPB. Ms. Hudson also serves as a legal advisor/counsel to the VA Atlanta Regional Office. Ms. Hudson is being sued in her official capacity.

E.   Al Bocchicchio, Regional Director, Veterans Benefits Administration

5

("VBA"), VA Atlanta Regional Office. Mr. Bocchicchio was the deciding official who approved Ms. Boyd's illegal termination. Mr. Bocchicchio is being sued in his official capacity.

F.    Patrick Zondervan, Regional Assistant Director, Veterans Benefits Administration ("VBA"), VA Atlanta Regional Office. Mr. Zondervan was the deciding official who proposed Ms. Boyd's illegal termination and who was made aware of information, allegations, etc. that supported Ms. Boyd's illegal termination. Mr. Zondervan is being sued in his official capacity.

G.    Sharon Key, Human Resources Lead, VA Atlanta Regional Office. Ms. Key was responsible for investigations, gathering of (alleged) evidence, etc. to support Ms. Boyd's illegal termination. Ms. Key also was aware of/in possession of, made aware of/and supplied the information, allegations, etc. that the VA used to support its illegal termination of Ms. Boyd. Ms. Key also serves as advisor/counsel to the VA (in situations that include personnel actions against VA employees). Ms. Key is being sued in her official capacity.

H.    United States Merit Systems Protection Board ("Board" or "MSPB"). The MSPB is a quasi-judicial agency of the United States charged with protecting the federal merit systems against partisan political and other prohibited personnel practices and to ensure adequate protection for federal employees against abuses

by agency management. Certain federal employees, like Plaintiff Thasha A. Boyd,

can appeal certain personnel actions (including terminations) to the MSPB.

I.    Sharon Pomeranz, Administrative Judge ("AJ"), Merit Systems

Protection Board, Atlanta Regional Office. Ms. Pomeranz was the AJ who not only

affirmed the VA's illegal termination of Ms. Boyd, but who also violated Ms.

Boyd's constitutional rights in arriving in such affirmation. Ms. Pomeranz is being

sued in her official capacity.

## LEGAL BACKGROUND

10.  The Due Process Clause of the Fourteenth Amendment provides "nor shall

any State deprive any person of life, liberty, or property, without due process of

law." U.S. Const. amend. XIV, § 1.

11.  The Due Process Clause of the Fifth Amendment also provides "No person

shall be... deprived of life, liberty, or property, without due process of law". U.S.

Const. amend V, § 1.

12.  The United States Supreme Court's interpretation of these clauses

establishes that public employees possess a constitutionally protected property

right in their continued employment. In *Cleveland Board of Education v.*

*Loudermill,* 470 U.S. 532 (1985), the Supreme Court held that pre-deprivation due

process is required in public employee discharge cases, stating,

7

"[w]e have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee." 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (internal quotation marks, footnote, and citations omitted).

13.   It is true that, as the Supreme Court recognized in *Loudermill,* there are "*some* situations in which a post-deprivation hearing will satisfy due process requirements." 470 U.S. at 542 n.7, 105 S.Ct. 1487 (emphasis added). But this does not mean that an employee enjoys no due process before removal.

14.   The Court of Appeals for the Federal Circuit's precedent, specifically its decisions in *Stone v. Federal Deposit Insurance Corp.*, 179 F.3d 1368 (Fed. Cir. 1999), *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1278 (Fed. Cir. 2011), and *Federal Education Association - Stateside Region, Karen Graviss v. Department of Defense, Dependents Elementary and Secondary School*, 841 F.3d 1362 (Fed. Cir. 2016) sets the requirements for the MSPB and federal agencies in determining constitutional due process for federal employees – pre, during, and post removal proceedings; and, when *ex parte* communication deprives an employee from due process.

8

15. The Federal Circuit, in its interpretation of *Loudermill*, also established that an adequate post-termination procedure may make up for an inadequate pre-termination process – thus satisfying an employees' constitutional rights to due process.

16. However, in *Ward* and *Graviss*, the Federal Circuit established that there are certain inadequate pre-termination processes which render an employee's termination null and void, thus dismissing the requirement for a post-termination process to correct the inadequate pre-termination process.

17. In *Stone*, the Federal Circuit articulated three relevant factors (commonly referred to as "*Stone* factors") that are to be considered in determining whether or not improper *ex parte* communication deprived an employee of due process.

18. The *Stone* factors consist of: whether (1) "the *ex parte* communication merely introduces `cumulative' information or new information"; (2) "the employee knew of the error and had a chance to respond to it"; and (3) the communications were "of the type likely to result in undue pressure upon the deciding official to rule in a particular manner." *Id.* Ultimately, the inquiry is "whether the *ex parte* communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Id.* Finally, the Federal Circuit made clear

that, if new and material information has been conveyed by the *ex parte* communication, "then a due process violation has occurred and the former employee is entitled to a new constitutionally correct removal procedure.... [W]hen a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test." *Id.* at 1377.

19.   Under the Administrative Procedure Act, *ex parte* communications in the formal adjudication context are prohibited when "the person responsible for the communication has knowledge [the proceeding] will be noticed." 5 U.S.C. § 557(d)(1)(E).  The MSPB, itself follows this rule. *See* 5 C.F.R. § 1201.102 (prohibiting *ex parte* communications "from the time the persons involved know that the Board may consider the matter until the time the Board has issued a final decision").

## BACKGROUND

20.   Ms. Boyd was honorably discharged from over eight years of service with the U.S. Army, and has since maintained over a decade of employment as a federal employee without disciplinary action(s). She accepted employment as Veterans Service Representative ("VSR") at the VA's Veterans Benefits Administration ("VBA") in September 2016.

21. On February 9, 2017, the VA (through Mr. Zondervan and Ms. Key) served Ms. Boyd with a notice of proposed disciplinary action (Exhibit A, hereinafter "Notice") for charges of "Inappropriate Conduct" and "Failure to follow your supervisor's instructions". Ms. Boyd filed a timely response; and, on April 19, 2017, Ms. Boyd received the VA's final determination, signed by Mr. Bocchicchio, which terminated Ms. Boyd's employment effective April 24, 2017 (Exhibit B, hereinafter "Removal").

22. The above mentioned charge(s) included specifications involving allegations from Matthew Jahn, an employee of the Disabled American Veterans ("DAV") – who claimed Ms. Boyd made unwanted sexual advances to him.

23. On April 19, 2017, Ms. Boyd filed an appeal of her termination to the MSPB (MSPB Docket No. AT-0752-17-0412-W-1); and, Administrative Judge ("AJ") Pomeranz was ultimately assigned to preside over the appeal.

24. On May 18, 2017, Ms. Hudson conducted a deposition of Ms. Boyd, where Ms. Boyd was questioned regarding allegations of sending gifts to Mr. Jahn and of speaking to Mr. Jahn at a gymnasium (and where Ms. Hudson threatened to use Ms. Boyd's responses to the deposition to bring perjury charges against Ms. Boyd). After the deposition, Ms. Boyd then reviewed the VA's response to her first discovery request(s) and saw e-mails of communication between Mr. Jahn, Mr.

11

Bocchicchio, Ms. Hudson, and Ms. Key – where the abovementioned allegations were made (Exhibit C, attached hereto).

25.  At the deposition, Ms. Boyd refused to respond to Ms. Hudson's line of questioning because [as Ms. Boyd informed Ms. Hudson at the deposition], neither the Notice (to include the VA's evidence file) or Removal included these allegations of giving gifts to Mr. Jahn and/or speaking to him at a gymnasium.

26.  Shortly after the deposition, Ms. Boyd filed a motion in limine and motion for protective order in discovery to the MSPB; and, Ms. Hudson's response included demand for Ms. Boyd to pay for the deposition of May 18, 2017.

27.  AJ Pomeranz denied Ms. Boyd's motion in limine and for a protective order in discovery. After termination of discovery and filing of briefs, on November 7, 2017, AJ Pomerzanz denied Ms. Boyd's appeal [of her termination from employment at the VA] and used Mr. Jahn's allegations to support her decision, as follows:

> "[T]here is other evidence in the record that supports Mr. Jahn's claims in his letter that the appellant [Ms. Boyd] was pursuing an unwanted relationship with him [Mr. Jahn]. For example, on February 15, 2017, Mr. Jahn e-mailed Sharon Key, an agency human resource liaison, to inform her that the previous day, Valentine's Day, he had

12

received flowers and a card that he believed to be from the appellant

[Ms. Boyd]." (Exhibit D at 8, 9)

28.  Ms. Boyd then filed an appeal of the MSPB's decision to the Federal

Circuit; on September 6, 2018, the Federal Circuit [by granting absolute deference

to AJ Pomeranz' decision] denied Ms. Boyd's appeal (and petition for rehearing

and rehearing en banc); and, the mandate was issued by the Federal Circuit on

September 13, 2018 (see Exhibit E).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Arbitrary and Capricious Agency Action in its Failure to Adhere to Agency
Procedures – Including the VA Handbook 5021
(APA and Agency [VA] Procedures violation)**

29.  The VA Handbook 5021 (Part I, Chapter 3, Paragraphs (e) and (f)) is clear

(see Exhibit F, attached hereto); and, states the following:

'e. If the notice of proposed adverse action is determined to be

procedurally defective so as to result in harmful error (i.e. error in the

application of these procedures which, in the absence or correction of

the error, might have caused management to reach a conclusion

different than the one reached) or if it is found that additional reasons

other than those set forth should be considered or that the appropriate

penalty should be more severe than that proposed, the notice of

13

proposed adverse action will be rescinded and a new notice of proposed action issued. The notice will include a new advance notice period and another opportunity to reply orally or in writing, or both orally and in writing. **If additional evidence becomes available to further support the charges in the advance notice, but does not necessarily provide a basis to alter the charges or the proposed penalty, the employee will be afforded the opportunity to respond to the new evidence before a final decision is made.**

f. Officials involved in taking an adverse action against an employee should be aware of the prohibitions against improper "ex parte communications." The MSPB has held that agency officials may communicate with each other during the decision making process. However, it is improper for an interested party (e.g. supervisor, proposing official), to pressure the decision official into making an adverse decision. Such communications are improper, and might support reversal of the action on appeal.'

30. There is no ambiguity and/or discretion that can be applied in the VA's interpretation and application of the abovementioned VA Handbook [especially the potions highlighted in bold font]. The VA was required to present Ms. Boyd with

Mr. Jahn's additional allegations (of Ms. Boyd giving him gifts and speaking to him in a gymnasium) before [emphasis added] the VA's issuance of its final determination to remove Ms. Boyd and regardless if the deciding official, Al Bocchiccio, claimed that he did not consider Mr. Jahn's additional allegations [in his final determination to remove Ms. Boyd].

31. The Federal Circuit, in *Stone*, also recognized that federal employees are afforded other protections that extend to an agency's own regulations as follows:

"[T]he Due Process Clause only provides the minimum process to which a public employee is entitled prior to removal." 179 F.3d at 1377-78. "Public employees are, of course, entitled to . . . other procedural protections . . . afforded them by statute, regulation, or agency procedure." Id. at 1378. Section 752.404(f) of 5 C.F.R., the regulation governing Agency procedure for removal of qualified employees, including Ward, provides that "[i]n arriving at its decision, the agency shall not consider any reasons for action other than those specified in the notice of proposed action." See *Douglas*, 5 MSPB at 331 n. 65, 5 M.S.P.R. 280; 5 C.F.R. § 752.401(c)."

32. However, AJ Pomeranz' decision affirming the VA's removal of Ms. Boyd

15

does not even address Ms. Boyd's argument(s) of the VA's violation of its own

VA Handbook 5021. Therefore, AJ Pomeranz' silence on this matter – especially

when there is MSPB and Federal Circuit precedent on this matter – was arbitrary

and capricious to say the least.

**SECOND CLAIM FOR RELIEF**
**Arbitrary and Capricious Agency Action in Violation of Ms. Boyd's**
**Constitutional Right to Due Process**
**(APA and Constitutional violation)**

33.  Ms. Boyd's constitutional right to due process pre and post termination was

violated by both the VA and the MSPB.

### *Pre-Termination Due Process Violations*

34.  An analysis of the *Stone* factors – as it relates to the improper *ex parte*

communication that took place between Mr. Jahn, Mr. Bocchicchio, Ms. Hudson,

and Ms. Key – demonstrate that Ms. Boyd's pre-termination process violated her

constitutional right to due process as follows:

### *Stone* Factor #1

35.  Whether or not the *ex parte* communication "[I]ntroduces 'cumulative'

information or new information." *Stone*, 179 F.3d at 1377. Mr. Jahn's additional

allegations consist of Mr. Jahn alleging that Ms. Boyd sent him gifts in February

(Valentine's Day) and May; and, that in March, Ms. Boyd spoke to him at a gym

they both use outside of the VA. Mr. Jahn's additional allegations of encounters

16

with Ms. Boyd is "new" because these allegations were made after the VA issued

the Notice of proposed disciplinary action against Ms. Boyd (said Notice is dated

February 9, 2017); and, consist of incidents not included in the Notice. Also, these

alleged incidents consist of new dates and accusations - therefore, they are not

"cumulative". Therefore, the first *Stone* factor is met.

### *Stone* **Factor #2**

36.   Whether "[T]he employee knew of the error and had a chance to respond to

it," *Stone*, 179 F.3d at 1377. While neither the Board and/or the VA dispute that

Ms. Boyd learned of Mr. Jahn's additional allegations after she was terminated,

both the MSPB and VA erroneously believe that after Ms. Boyd's removal and

during the proceedings in front of the MSPB is when these additional allegations

can be introduced and resolved. This is a clear legal error which is not consistent

with the U.S. Supreme Court and the Federal Circuit's precedent.

37.   In *Loudermill*, the Supreme Court recognized that there are "some

situations in which a post-deprivation hearing will satisfy due process

requirements" 470 U.S. at 542 n.7, 105 S.Ct. 1487 (emphasis added). However, the

Federal Circuit's precedent - as stated in *Graviss*, is that:

> "[T]his does not mean that an employee enjoys no due process before
>
> removal. Our recognition of the importance of pretermination due

process dates back at least to our holding in *Stone*. See 179 F.3d at 1376 ("An employee is entitled to a certain amount of due process rights at each stage and, when these rights are undermined, the employee is entitled to relief regardless of the stage of the proceedings."); see also *Ward*, 634 F.3d at 1282 ("If the Board finds that the communications did introduce new and material information in violation of [Petitioner's] due process rights, [Petitioner] must be afforded a constitutionally correct removal procedure." (internal quotation marks omitted)). Recently, this court has squarely rejected the idea that an adequate post-termination review can cure a procedurally deficient termination proceeding. See *Young*, 706 F.3d at 1377 ("[Petitioner] was entitled to procedural fairness at each stage of the removal proceedings, not just upon review of the termination decision." (internal quotation marks omitted))."

38.  Ms. Boyd argued to the VA and the MSPB that pursuant to *Ward*, AJ Pomeranz had no legal right to allow the VA to perform a deposition on Ms. Boyd regarding allegations from Mr. Jahn that were not included in the Notice - and that AJ Pomeranz could not use these additional allegations to sustain the VA's removal of Ms. Boyd. However, while the VA declined to reschedule the

deposition of Ms. Boyd, AJ Pomeranz opted to take the improper *ex parte* communications (the additional allegations from Mr. Jahn) and include them as evidence she considered to support Ms. Boyd's removal, as follows:

> "[T]here is other evidence in the record that supports Mr. Jahn's claims in his letter that the appellant [Ms. Boyd] was pursuing an unwanted relationship with him [Mr. Jahn]. For example, on February 15, 2017, Mr. Jahn e-mailed Sharon Key, an agency human resource liaison, to inform her that the previous day, Valentine's Day, he had received flowers and a card that he believed to be from the appellant [Ms. Boyd]."

This is a clear legal error requiring reversal of Ms. Boyd's termination - as follows 'The Board is not permitted to cure the agency's errors during the adjudication process. *Ward v. U.S. Postal Service*, 634 F.3d 1274, 1278 (Fed. Cir. 2011) (explaining that "the Board erred in concluding that it could 'remedy the error'")'. Therefore, the second *Stone* factor is met.

### *Stone* Factor #3

39. Whether the *ex parte* communication is "[O]f the type likely to result in undue pressure upon the deciding official to rule in a particular manner," *id.*

40. In *Graviss*, pursuant this Federal Circuit's analysis of Stone:

"The third Stone factor, whether the communications were "of the type likely to result in undue pressure upon the deciding official to rule in a particular manner," *Stone,* 179 F.3d at 1377 (emphasis added), specifically directs the inquiry to the "type" of communication involved, and does not require proof that the ex parte communication actually resulted in undue pressure upon the deciding official to rule in a particular manner. Indeed, we held in *Stone* that "[u]ltimately, the inquiry ... is whether the ex parte communication is so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." Id. (emphasis added). While proof of subjective undue influence from an undisclosed communication may support a conclusion that there has been a due process violation, the absence of subjective influence does not foreclose the possibility of a violation. See *Ward,* 634 F.3d at 1280 n.2."

41. AJ Pomeranz, on top of not performing an analysis of the *Stone* factors and/or a harmful error analysis, decided that the deciding official, Al Bocchicchio's, self-serving generalized written statement (as Ms. Boyd did not

request a hearing) stating that he did not consider Mr. Jahn's additional allegations, was sufficient evidence to show that no due process violation took place. However, this is not consistent with the third *Stone* factor.

42. Mr. Jahn's allegations of Ms. Boyd sending him gifts in February [Valentine's Day] and May; and, of Ms. Boyd speaking to him again in March at a gym is the "type" [emphasis added] of communication that is substantial enough to cause prejudice. It was substantial enough for the VA to attempt question Ms. Boyd about it during a deposition post-termination. It was substantial enough for AJ Pomeranz to deny Ms. Boyd's motion for limine and protective order in discovery and for the AJ [herself] to use these allegations to sustain the VA's removal of Ms. Boyd. *Id*. Therefore, the third *Stone* factor is met.

***Post-Termination Due Process Violations***

43. On top of Ms. Boyd suffering a pre-termination process that violated her constitutional right to due process, the MSPB (through AJ Pomeranz) provided Ms. Boyd with a post-termination process that also violated Ms. Boyd's constitutional right to due process.

44. First, AJ Pomeranz denied Ms. Boyd's motion in limine and motion for a protective order (these motions were filed by Ms. Boyd to counter the improper *ex parte* communication that the VA tried to conduct a deposition on her for).

21

45. Next, AJ Pomeranz took the improper *ex parte* communication and used it to support her decision affirm the VA's termination of Ms. Boyd – and even took issue with Ms. Boyd's lack of a response to the improper *ex parte* communication.

46.  Lastly, AJ Pomeranz blocked any opportunity for Ms. Boyd to refute the improper *ex parte* communication by denying Ms. Boyd's motion for subpoena to Mr. Jahn and his employer, the DAV; and, by denying Ms. Boyd's motion to compel the VA's response to her discovery.

47. AJ Pomeranz also capriciously and arbitrarily would not conduct the precedent binding *Stone* factors and/or harmful error analysis in determining whether or not the *ex parte* communication consisted of a due process violation. AJ Pomeranz summarized that Al Bocchicchio's self-serving, written, sworn statement was enough to show that no due processes violation took place; and, she remained silent as to whether or not the VA violated its own VA Handbook upon termination of Ms. Boyd's employment.

48.  Accordingly, the MSPB's arbitrary and capricious actions denied Ms. Boyd a post-termination hearing that would preserve her constitutional right to due process.

## PRAYER FOR RELIEF

49. WHEREFORE, Plaintiff prays for an order and judgment:

a. Declaring that the VA's termination of Ms. Boyd's employment violates the Fifth and Fourteenth Amendment of the U.S. Constitution; and, is null, void and with no force or effect.

b. Declaring that the MSPB's affirmation of the VA's termination of Ms. Boyd's employment violates the Fifth and Fourteenth Amendment of the U.S. Constitution; and, is null, void and with no force or effect.

c. Awarding Plaintiff her reasonable costs, including attorneys' fees, incurred in brining this action; and,

d. Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Thasha A. Boyd
1655 Carrie Farm Ln NW
Kennesaw, GA 30144
678-520-8465
laanatassha@aol.com

## CERTIFICATION OF FONT

This certifies that pursuant to LR 5.1, N.D., GA, the above and foregoing

has been prepared using Times Roman New font, 14 point. This 28th day of

September, 2018.

Respectfully submitted,

Thasha A. Boyd
1655 Carrie Farm Ln NW
Kennesaw, GA 30144
678-520-8465
laanatassha@aol.com

# Exhibit A

# Department of
# Veterans Affairs

# **Memorandum**

Date:   February 09, 2016

From:   Patrick Zondervan, Assistant Director

Subj:   Proposed Removal – Inappropriate Conduct

To:   .Thasha Boyd, Veterans Service Representative

1.  It is proposed to remove you from your position as a Veterans Service Representative, GS-7, and from your employment with the Department of Veterans Affairs based on the following reasons:

**Charge 1**:  Inappropriate Conduct

**Specification A:**  On or about December 7, 2016, I received a letter from a Disabled American Veteran (DAV) employee, Mr. Matthew Jahn.  In the letter Mr. Jahn indicated that he was "filing a formal complaint" against you for "making sexual advances" towards him.  The letter stated that Mr. Jahn informed you that he "was in a relationship well over a month ago" and you "claimed that [you] understood and would leave [him] alone."  He stated that since then, you have repeatedly visited his desk and "continue to harass" him.  Mr. Jahn also indicated that during these visits, you touched his leg and back and attempted to kiss him.  The letter further provided that on December 7, 2016, you asked him, "when I get home, if I was going to think about f\*\*\*\*\*\*g her."

In response to the December 7, 2016 letter, a fact finding into Mr. Jahn's complaints against you was conducted.  During the fact finding, Mr. Jahn reaffirmed his previous reports. During the fact finding you indicated that you "don't believe [you] did" ever kiss or attempt to kiss him, "don't recall" whether you ever spoke with him about sexual relations or body parts, and "don't recall" if you ever touched his leg on work premises.

**Specification B**:  On or about December 6, 2016, you engaged in disrespectful, insulting and insolent behavior while your supervisor held a meeting to address the entire training class regarding the rules and behavior in the workplace.  Specifically, you interrupted your supervisor as she was speaking to the class and raised your voice as you called your co-workers liars and children or words to that affect.  You were informed by your supervisor and the AFGE union president that you were being inappropriate; yet, you continued to disrupt the meeting.

**Specification C**:  On or about December 1, 2016, at approximately 10:00 AM, your supervisor witnessed your disruptive behavior in the classroom during an incident that occurred with you and your co-worker.  During the incident you screamed in a loud voice at the co-worker, "If you need me to move, I can move" or words to that affect.  Your outburst was such that it was

disruptive to the entire classroom. Your supervisor removed you from the class in an effort to calm you down. This type of behavior is not appropriate for the workplace.

**Charge 2:** Failure to follow your supervisor's instructions

**Specification A:** On or about December 12, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative" in the Public Contact Team (PCT) area of the Atlanta Regional Office. The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." The SAN instructed you to contact your supervisor if there was a "business need in DAV that requires contact with Mr. Jahn." On or about December 13, 2016, you entered the PCT area at approximately 5:57:37AM and left a typed letter and a drink on Mr. Jahn's desk.

Your written communication with Mr. Jahn is a direct violation of the SAN issued on December 12, 2016.

**Specification B:** On or about December 12, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative." The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." On December 13, 2016, Mr. Jahn reported that as he was walking back to his office from the VA Medical Center, you approached him and stated, "[we are] not in the building, so we can talk out here." When asked during the fact finding about your contact with Mr. Jahn since the issuance of the SAN, you stated that the SAN was "improperly issued," you asked for clarification, and you invoked the "5th Amendment."

Your verbal communication with Mr. Jahn is a direct violation of the SAN issued on December 12, 2016.

2. **Right to Reply:** If you choose to do so, you have until close of business on the 14th calendar day after your receipt of this notice to reply to this notice orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charges are unfounded and any other reasons why your removal should not be effected. Your written reply should be submitted to Mr. A. Bocchicchio, Director. The Director will receive your oral reply or will designate an official or officials to receive it. You may make arrangements for your oral reply by calling me at (404) 929-5818 or the Director's Assistant at (404) 929-5818.

3. **Right to Review Material:** The evidence file on which this proposed action is based is enclosed for your review.

4. **Aggravating Factors Considered In Determining Penalty:** The attached Douglas factor considerations will be taken into consideration when determining the appropriate penalty. You may reply orally or in writing, or both orally and in writing, with respect to these previous infractions and you may submit supporting evidence, including affidavits. In this regard, you

may make a statement expressing your views as to the consideration to be given such factors in determining proper action.

5. **Right to Representation:** You have the right to be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision. Please advise me in writing of any representative designated.

6. **Decision:** The final decision to effect the action proposed has not been made. The Director, who will make the final decision, will give full and impartial consideration to your reply, if submitted, the evidence upon which this notice of proposed action is based, and my assessment of the aggravating factors that I considered in recommending the proposed penalty.

7. **Effective Date:** If it is the decision of the Director that you be removed, your removal will be effective not less than 30 calendar days from the date of your receipt of this notice.

8. **Duty Status:** You will be placed in an administrative leave status with no loss of pay during this period.

9. If you have any questions or do not understand the above reasons why your removal is proposed, you may contact the Human Resources Liaison at (404) 929-5845.

_____          __2/9/2017__
Patrick Zondervan                         Date
Assistant Director


You are requested to sign and date the acknowledgement copy of this memorandum as evidence that you have received it. Your signature does not mean you agree or disagree with the contents of this memorandum. However, your failure to sign the acknowledgement copy will not void the contents of this memorandum.

_____          __Feb 2, 2017__
Thasha Boyd                               Date


Enclosures

Evidence file
Douglas Factors

# Exhibit B



**DEPARTMENT OF VETERANS AFFAIRS**
**ATLANTA REGIONAL OFFICE**
**1700 CLAIRMONT ROAD**
**DECATUR, GA 30033**

April 18, 2017                                    In reply refer to: (316/00)

Ms. Thasha Boyd
1655 Carrie Farm Ln NW
Kennesaw, GA. 30144

SUBJECT: Removal

1. In connection with the letter dated February 9, 2017 in which you were given advance notice of your proposed removal, a decision has been made to remove you from employment with the U.S. Department of Veterans Affairs, Atlanta Regional Office, Decatur, Georgia, effective close of business April 24, 2017 based on the following reason(s):

**Charge 1:** Inappropriate Conduct

**Specification A:** On or about December 7, 2016, I received a letter from a Disabled American Veteran (DAV) employee, Mr. Matthew Jahn. In the letter Mr. Jahn indicated that he was "filing a formal complaint" against you for "making sexual advances" towards him. The letter stated that Mr. Jahn informed you that he "was in a relationship well over a month ago" and you "claimed that [you] understood and would leave [him] alone." He stated that since then, you have repeatedly visited his desk and "continue to harass" him. Mr. Jahn also indicated that during these visits, you touched his leg and back and attempted to kiss him. The letter further provided that on December 7, 2016, you asked him, "when I get home, if I was going to think about f******g her."

In response to the December 7, 2016 letter, a fact finding into Mr. Jahn's complaints against you was conducted. During the fact finding, Mr. Jahn reaffirmed his previous reports. During the fact finding you indicated that you "don't believe [you] did" ever kiss or attempt to kiss him, "don't recall" whether you ever spoke with him about sexual relations or body parts, and "don't recall" if you ever touched his leg on work premises.

**Specification B:** On or about December 6, 2016, you engaged in disrespectful, insulting and insolent behavior while your supervisor held a meeting to address the entire training class regarding the rules and behavior in the workplace. Specifically, you interrupted your supervisor as she was speaking to the class and raised your voice as you called your co-workers liars and children or words to that affect. You were informed by your supervisor and the AFGE union president that you were being inappropriate; yet, you continued to disrupt the meeting.

**Specification C:** On or about December 1, 2016, at approximately 10:00 AM, your supervisor witnessed your disruptive behavior in the classroom during an incident that occurred with you and your co-worker. During the incident you screamed in a loud voice at the co-worker, "If you need me to move, I can move" or words to that affect. Your outburst was such that it was disruptive to the entire classroom. Your supervisor removed you from the class in an effort to calm you down. This type of behavior is not appropriate for the workplace.

Charge 1 (Inappropriate conduct) is sustained.

**Charge 2:** Failure to follow your supervisor's instructions

**Specification A:** On or about December 12, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative" in the Public Contact Team (PCT) area of the Atlanta Regional Office. The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." The SAN instructed you to contact your supervisor if there was a "business need in DAV that requires contact with Mr. Jahn." On or about December 13, 2016, you entered the PCT area at approximately 5:57 AM and left a typed letter and a drink on Mr. Jahn's desk. Your written communication with Mr. Jahn is a direct violation of the SAN issued on December 12, 2016.

**Specification B:** On or about December 12, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative." The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." On December 13, 2016, Mr. Jahn reported that as he was walking back to his office from the VA Medical Center, you approached him and stated, "[we are] not in the building, so we can talk out here." When asked during the fact finding about your contact with Mr. Jahn since the issuance of the SAN, you stated that the SAN was "improperly issued," you asked for clarification, and you invoked the "5th Amendment." Your verbal communication with Mr. Jahn is a direct violation of the SAN issued on December 12, 2016.

Charge 2 (Failure to follow your supervisor's instructions) is sustained.

2. In reaching this decision, your written response was carefully considered. You did not request an in- person meeting in conjunction with the proposed removal. The evidence of record supports sustaining the charges and specifications above. I found that the mitigating circumstances provided by you in your written response do not rise to the level that would lessen the penalty due to the seriousness of the offense.

3. I have considered other factors including your years of service, your past work record, the seriousness of the offenses with which you have been charged and other factors including whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty.

I have reviewed the evidence file, as well as the Douglas Factors analysis that was attached to your proposed removal letter. I have also considered the consistency of penalty imposed on past VA employees for same or similar offenses, consistency with the agency's table of penalties, and your potential for rehabilitation.

The charges are consistent with the table of penalties and are consistent with similar penalties issued to other employees for similar incidents. We have had similar incidents at this facility and compared the consistency of penalties for these offenses and a similar penalty was administered. The offenses are serious and egregious in nature and could have had an adverse impact on not only our RO employees and visitors, but on our reputation with our external stakeholders as well. This type of conduct affects management's trust and confidence in your interactions with Agency stakeholders and also in your ability to comply with rules and policies.

A review of the evidence of record indicates that you have approximately 6 months of service with the agency, you are in a trainee status and have not had a performance evaluation in your current position, and you have no past record of disciplinary action in your employment record with the Agency. Your current position involves interaction with Veterans and requires trust.

4. The offenses in question had a serious effect on your ability to perform your job and to uphold the organizational mission. Furthermore, your inappropriate behavior was not aligned with the organization's mission or with the ICARE values.

The potential for rehabilitation is not evident based on your failure to adhere to the ethical standards that you learned during your training when you began your employment with our organization and your lack of remorse for the incident. You failed to use due diligence and the highest ethical standards to guide your actions. You should have been aware that your behavior was inappropriate in that you received the Under Secretary's Policies on harassment in the workplace as described VBA Letters 20-14-15 and 20-13-12. Additionally, on September 19, 2016, you signed and initialed the In-processing Information for New Employees document indicating that you were briefed on the content and given a copy of the VA Policy regarding Harassment/ Sexual Harassment. While these VA policies were not considered as charging elements, the policies were considered as penalty aggravators.

5. I have not identified any mitigating circumstances that would justify an adjustment of the proposed penalty. After careful consideration of the facts and circumstances surrounding this action, I have concluded that the sustained charges against you are of such gravity that mitigation of the proposed penalty is not warranted, and that the penalty of removal is appropriate and within the range of reasonableness. Therefore, I find this action was proposed only for such as would promote the efficiency of the service.

6. You are entitled to

    a. appeal this action to the Merit Systems Protection Board (MSPB) or
    b. seek corrective action before the U. S. Office of Special Counsel (OSC) or
    c. file a grievance under the negotiated grievance procedure or

d.  a discrimination complaint with the Office of Resolution Management
(ORM).

You shall be deemed to have exercised your option to appeal the adverse action at such time
as you timely initiate action to appeal to MSPB or the OSC, or timely file a grievance in writing
under the negotiated grievance procedure, or a discrimination complaint.
If your appeal includes an allegation that the facility engaged in a prohibited personnel action
in retaliation for protected whistleblowing, you may elect to file an appeal to MSPB, OSC, or a
negotiated grievance and your election is based on which election you file first.

7.  Merit Systems Protection Board (MSPB): If you appeal to the MSPB, your appeal may be
submitted by mail, facsimile, by commercial overnight delivery, by electronic filing at https://e-
appeal.mspb.gov, or in person at any time after you receive this letter, but not later than 30
calendar days after the suspension has been effected, or 30 calendar days after the date of
the your receipt of this decision, whichever is later.
The address to mail your appeal is as follows: Merit Systems Protection Board, 401 W.
Peachtree Street, NW, Suite 1050, Atlanta, Georgia 30308. You must submit an original and
one copy of both your appeal and all attachments.

If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it
will be dismissed as untimely filed unless a good reason for the delay is shown. The judge will
provide you an opportunity to show why the appeal should not be dismissed as untimely. A
copy of the form is available by request if you are unable to access it at the MSPB website.
Please refer to www.mspb.gov for information regarding the appeals process and procedures
that must be followed. You may be represented by an attorney or other representative of your
choice. If you decide to file an appeal with MSPB, you should notify the Board that the
agency's point of contact for this appeal is: Department of Veterans Affairs, Sharon Key,
Acting Human Resources Liaison, 1700 Clairmont Road, Decatur, GA 30033, telephone
number (404) 929-5845, fax number (404) 929-5848, and the email address is
sharon.key@va.gov.

8.  Office of Special Counsel (OSC):  If you elect to seek corrective action by the OSC's
Complaints Examining Unit (www.osc.gov/oscefile), your appeal will be limited to a
determination as to whether the agency took one or more covered personnel actions against
you in retaliation for making one or more protected whistleblowing disclosures, which
constitutes a prohibited personnel practice in accordance with 5 USC 2302(b). If OSC
dismisses your claim, you may file an individual right of action (IRA) appeal to MSPB, but
MSPB will only adjudicate whether you proved that your protected disclosure was a
contributing factor in the effected adverse action.

9.  Negotiated Grievance: If you elect to file a grievance through the negotiated grievance
procedures, your written grievance must be submitted within 30 calendar days of the date you
receive this letter, in accordance with the provisions of the labor agreement between the
Department of Veterans Affairs and American Federation of Federal Employees, AFGE Local
517. If you elect to file a grievance, you will be entitled to union representation as provided for
in the negotiated agreement. Additionally, if you believe you have been subjected to

discrimination within the meaning of 5 U.S.C. 2302(b) (1), you have the right to file a request for the MSPB to review the arbitrator's decision within 35 days after the date of issuance of the decision, or, if you show that you received the decision more than 5 days after the date of issuance, within 30 days after the date you received the decision. If you do not raise the issue of discrimination in the negotiated grievance procedures and subsequently request that MSPB review the arbitration's decision regarding your grievance, MSPB will not allow the issue of discrimination to be raised.

The request for review must be filed with the Clerk of the Board, Merit Systems Protection Board, 1615 M Street, Washington, DC 20419, and must contain the following:

a) A statement of the grounds on which review is requested;

b) References to evidence of record or rulings related to the issues before the Board;

c) Arguments in support of the stated grounds that refer specifically to relevant documents and that include relevant citations of authority; and

d) Legible copies of the final grievance or arbitration decision, the agency decision to take the action, and other relevant documents. The documents may include a transcript or recording of the hearing.

10. Equal Employment Opportunity Commission (EEOC): If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or handicap, you may file a complaint of discrimination or raise the issue of discrimination in any appeal to MSPB, or in a grievance under the negotiated grievance procedure as described above, when the negotiated grievance procedure allows a complaint of discrimination to be raised in connection with a grievance. If you do not raise the issue of discrimination in the negotiated grievance procedures and subsequently request that MSPB review the arbitration's decision regarding your grievance, MSPB will not allow the issue of discrimination to be raised.

If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-737-3361. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

11. Whichever is filed first, an appeal to the MSPB, an appeal for corrective action to OSC, a grievance under the negotiated grievance procedure, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process.

12. A further explanation of your appeal rights may be obtained by consulting the Human Resources Liaison at (404) 929-5845.

A. Bocchicchio
Director

# Exhibit C

# Agency 5/17/2017 Production

**Hudson, Monique**

| | |
|---|---|
| **From:** | KEY, SHARON, VBAATLD |
| **Sent:** | Wednesday, February 15, 2017 11:33 AM |
| **To:** | Hudson, Monique |
| **Subject:** | FW: Photos |
| **Attachments:** | flowers.jpg; Card 1.jpg; card 2.jpg; card 3.jpg |
| **Signed By:** | sharon.key@va.gov |

**From:** JAHN, MATTHEW
**Sent:** Wednesday, February 15, 2017 9:15 AM
**To:** KEY, SHARON, VBAATLD
**Subject:** Photos

Good Morning,

I have attached the photos of the flowers and card, that were requested.

I received this valentines gift yesterday. I asked my significant other if she had sent them (because that's not something she would send me). She said no and wanted to know who sent them. There was no name on the card so I contacted the flower shop that was listed on the card. They gave me another number to call seeing's how they were put in as an online order. The online site pulled up the order number and informed me that they could not tell me who sent them because they signed a form saying they wanted to be anonymous and that they could not give me the name of the person who sent them. I contacted a few of my ex's to see if any of them sent the flowers and they all said that they did not. I tried to rule everyone out that I thought would send them. The only person that is left that comes to mind is Ms. Boyd.

Matthew Jahn National Service Officer
DAV | Atlanta Regional Office| 1700 Clairmont Road | Decatur GA 30033
Main Office (404) 929-5956 | Fax (404) 929-5332

 FULFILLING OUR PROMISE
TO THE MEN AND WOMEN WHO SERVED

# Agency 5/17/2017 Production

**HILLS, JOAN E.**

| | |
|---|---|
| **From:** | KEY, SHARON, VBAATLD |
| **Sent:** | Wednesday, May 17, 2017 10:13 AM |
| **To:** | HILLS, JOAN E. |
| **Subject:** | FW: Ref. contact from Ms. Boyd |
| **Attachments:** | Sticky Note (Ms. Boyd).jpg; Envelope sticker (Ms. Boyd).jpg |
| **Signed By:** | sharon.key@va.gov |

**From:** JAHN, MATTHEW
**Sent:** Tuesday, May 02, 2017 9:58 AM
**To:** BOCCHICCHIO, Al, VBAATG
**Cc:** KEY, SHARON, VBAATLD
**Subject:** Ref. contact from Ms. Boyd

On April 28, 2017, When I came back from lunch there was a FedEx package on my desk. After opening it I realized instantly who it was from (Ms. Boyd) based on the sticker that was used to seal the envelope. It was the same symbol that was on her sticky notes that she used to write her number on.

There was another incident back in early March, when Ms. Boyd showed up at the same gym I went too and asked if I had received the flowers that she sent me back on Valentine's Day. I answered with I wondered where those came from, and she followed up with I put them in a Ford truck vase because I drive a Ford truck. She asked me why I turned her in because she thought she did nothing wrong. I explained that when I asked her to stop, that she was out of line, and that she agreed, but then continued to come by and make me feel uncomfortable. She said that she agreed to not come by because she couldn't contain herself around me. She continued to talk and stated that if in 3 – 5 years if me and my girlfriend are not together to call her. I said that I had nothing else to say and left to go to another gym.

Matthew Jahn National Service Officer
DAV | Atlanta Regional Office| 1700 Clairmont Road | Decatur GA 30033
Main Office (404) 929-5956 | Fax (404) 929-5332


TO THE MEN AND WOMEN WHO SERVED

# Exhibit
# D

indicated that she believes Mr. Jahn had a motive to retaliate against her, in part because she told him she was a whistleblower, she has not explained the reasons for her belief. I find that Mr. Jahn's credibility is bolstered by the statements of his co-workers who reported the appellant's frequent visits and particularly the statement of Mr. Cluff who described Mr. Jahn as visibly upset after at least one of the appellant's visits and the appellant's own actions which show her continuing to pursue Mr. Jahn even after his complaint and the SAN was issued.

In addition, while not used to support this specification, there is other evidence in the record that supports Mr. Jahn's claims in his letter that the appellant was pursuing an unwanted relationship with him. For example, on February 15, 2017, Mr. Jahn e-mailed Sharon Key, an agency human resource liaison, to inform her that the previous day, Valentine's Day, he had received flowers and a card that he believed to be from the appellant.[15] IAF, Tab 29 at 81-85. In an e-mail dated May 2, 2017, Mr. Jahn notified Ms. Key that, on April 28, 2017, he returned from lunch to find a FedEx package on his desk which he believed to be from the appellant based on the "sticker that was used to seal the envelope . . . [which] was the same symbol that was on her sticky notes that she used to write her number on."[16] *Id.* at 88.

Although the appellant included a sworn statement with her close of record submission, she does not specifically deny the conduct set out in this specification. IAF, Tab 29 at 1-47 of 166. Rather, the appellant alleges that there were "no witnesses to Mr. Jahn's allegations." IAF, Tab 29 at 42.

---

[15] Mr. Jahn included photos of the flowers and the card which included the following message, "Love Your Smile and Sense of Style . . . Man, How You Make Me Blush Like A Child . . . Will You Be Mine – The Master Of My Heart, Body, And Desire? My Dear Valentine? Yours, Truly Yours . . . Babe." IAF, Tab 29 at 85.

[16] In that same e-mail Mr. Jahn informed Ms. Key that the appellant had shown up at his gym in early March and had asked him if he had received the Valentine's Day flowers that she had sent to him. IAF, Tab 29 at 88.

However, the appellant was a witness to the events and I find it particularly troubling that she failed to address Mr. Jahn's claims by either affirming or denying them in her sworn submission.[17]

The appellant has argued that this specification required the agency to prove the elements of sexual harassment. I disagree. The agency, in this specification, was merely recapping the appellant's conduct as characterized by Mr. Jahn in his written complaint. A charge of inappropriate conduct, such as the one here, does not require a showing of intent and the agency's description of the appellant's conduct through the lens of Mr. Jahn's complaint does not turn the inappropriate conduct charge into a sexual harassment charge as the appellant alleges.[18]

Based on the above, I find that a preponderance of the evidence supports this specification and it is sustained.

Preponderant Evidence Supports Specification B.

Specification B of Charge 1 stated as follows:

> On or about December 6, 2016, you engaged in disrespectful, insulting and insolent behavior while your supervisor held a meeting to address the entire training class regarding the rules and behavior in the workplace. Specifically, you interrupted you supervisor as she was speaking to the class and raised your voice as you called your co-workers liars and children or words to that affect. You were

---

[17] In addition, based on certain statements the appellant has made on what occurred during the prehearing conference in this appeal, I seriously question her ability to accurately reflect events as they occurred. The appellant has made statements in both her closing submission and her rebuttal that are simply incorrect. IAF, Tabs 29 and 32. As previously explained, *supra* at footnote 1, the appellant completely mischaracterized my comments about the Agency File and the document index in her closing submission. She further misconstrues what took place at the conference in her rebuttal where she states that the undersigned was planning to allow the agency to resubmit its Agency File. IAF, Tab 32 at 6 of 53. To the contrary, I specifically informed the parties that I was not going to do that because I did not want to delay the proceedings in this appeal.

[18] To the extent the agency has referenced agency policies governing sexual harassment, I find they were used to show notice and the seriousness of the appellant's conduct.

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
ATLANTA REGIONAL OFFICE

THASHA A. BOYD,                    DOCKET NUMBER
          Appellant,              AT-0752-17-0412-I-1

     v.

DEPARTMENT OF VETERANS             DATE: November 1, 2017
AFFAIRS,
          Agency.

Thasha A. Boyd, Kennesaw, Georgia, pro se.

Monique Wright Hudson, Esquire, Decatur, Georgia, for the agency.

BEFORE
Sharon J. Pomeranz
Administrative Judge

INITIAL DECISION

The appellant filed this appeal to contest the agency's decision to remove her from her position of Veterans Service Representative with the Veterans Benefits Administration in Atlanta, Georgia. Initial Appeal File (IAF), Tabs 1; 10 at 129-133. The appellant was removed based on charges of misconduct.

The Board has jurisdiction over this appeal pursuant to 5 U.S.C. §§ 7511(a)(1), 7512(1), and 7513(d). The appellant did not request a hearing so this

---

2

decision is being decided based upon the written submissions of the parties.[1] For the reasons set forth below, the agency's action is AFFIRMED.

ANALYSIS AND FINDINGS

Background

The following facts are not in dispute. On August 25, 2016, the appellant was interviewed for a position as a Veterans Service Representative, GS-0996-07, with the agency's Veterans Benefits Administration's Atlanta Regional Office. IAF, Tab 10 at 93-101.[2] On September 18, 2016, the appellant received an excepted service appointment to the position.[3] Id. at 126.

On December 7, 2016, Matthew Jahn, an employee of the Disabled American Veterans (DAV) filed a complaint against the appellant stating that she had been making sexual advances towards him.[4] Id. at 119; Tab 11 at 49. In his complaint, Mr. Jahn stated that he had informed the appellant that he was in a

---

[1] The appellant's argument that the agency be precluded from submitting affidavits as part of its close of record submissions, because she requested them in discovery and they should therefore have prepared them at that point, is simply wrong. The statements submitted by the agency are not discovery, they are written declarations in lieu of oral testimony.

[2] In her close of record submission, the appellant mischaracterizes the discussion regarding the Agency File conducted during the close of record conference on July 26, 2017. IAF, Tab 29. During the close of record conference, I ordered the agency to submit a list of exhibits that were provided to the appellant with the proposal letter and to identify where they were located in the Agency File because, as I informed the parties during the conference, the Agency File was not clear in that regard. To the extent, the appellant is requesting that the agency be sanctioned in her close of record submissions, I find the agency complied with my order and the appellant's request is denied.

[3] The appellant is a preference eligible veteran, who worked for the Internal Revenue Service immediately preceding her appointment to the agency. IAF, Tab 10 at 127-28. Thus, at the time of her appointment she had one year of current continuous service. See 5 U.S.C. § 7511(a)(1)(B)(ii).

[4] Mr. Jahn worked for the DAV at the agency's Atlanta Regional Office where he had a cubicle not far from where the appellant worked.

---

3

relationship but that she "continues to harass me" and "she has started to touch my leg, back, and tries to kiss my neck." Id. In addition, Mr. Jahn stated, "Just today she asked me, 'when I get home, if I was going to think about f*****g her." Id.

On December 12, 2016, Chantal Wynter, the appellant's supervisor, issued the appellant a Stay Away Notification (SAN). IAF, Tab 11 at 52. Ms. Wynter's memorandum stated, "Effective immediately, and until further notice, you are instructed to have absolutely no contact or (written/verbal) communication with Matthew Jahn, DAV Representative. Violation of these instructions may result in disciplinary or adverse action being taken against you."[5] Id. (Emphasis in original).

On December 13, 2016, Mr. Jahn reported that he arrived at work to discover a letter and a drink from the appellant on his desk. IAF, Tab 11 at 53. Later that day, the appellant tried to make contact with Matthew Jahn while he was outside walking between two buildings on the VA campus. Id. According to Mr. Jahn, the appellant approached him and said since they were not in the VA building, that they could talk out there. Id. When Mr. Jahn told her there was a no contact order, the appellant said she would leave him alone.[6] Id.

On December 21, 2016, Stephanie DiBello, Veterans Service Center Manager, issued the appellant a memorandum notifying her of a temporary reassignment of her duty location. IAF, Tab 10 at 122. In the memorandum, Ms. DiBello informed the appellant that she was being directed to work from home

---

[5] The SAN further informed the appellant that if she had a business need to contact Mr. Jahn, she should consult with Ms. Wynter or "a designated management official in the Veterans Service Center so that appropriate contact can be arranged." IAF, Tab 11 at 52.

[6] Mr. Jahn reported the appellant's contact with him to his supervisor.

---

4

pending an inquiry until further notice.[7] Id. The appellant was further informed that she was not to return to the Atlanta Regional Office for any reason unless approved by her supervisor. Id. On December 28, 2016, Ms. DiBello issued a second temporary duty memorandum. IAF, Tab 10 at 123. In this memorandum, the appellant was instructed to report to the Health Eligibility Center, as an alternate work site.[8] Id. On January 12, 2017, the appellant was directed to return to her official duty station.[9] IAF, Tab 10 at 124.

Starting in late December of 2016, and continuing through early January of 2017, the agency conducted a fact-finding investigation into Mr. Jahn's complaint. IAF, Tab 11 at 56-63. At some point, the appellant requested that the matter between her and Mr. Jahn be mediated, which the agency declined to do. IAF, Tab 11 at 69-74.

On February 9, 2017, the agency proposed the appellant's removal based on charges of misconduct. IAF, Tab 10 at 134-136. The appellant submitted a written response to the proposed removal on February 23, 2017. IAF, Tab 10 at 137-170. On April 18, 2017, the deciding official, A. Bocchicchio, Director of the Atlanta Regional Office, issued a decision sustaining the charges and finding the penalty of removal appropriate. Id. at 129-133. The appellant's removal was effective on April 24, 2017. Id. at 129. This appeal followed.

---

[7] During the detail, the appellant was instructed to report to her supervisor, Ms. Wynter. IAF, Tab 10 at 122.

[8] According to the memorandum, the change in temporary duty locations was necessary because the appellant's home address did not meet the agency's safety requirements for telework. IAF, Tab 10 at 123.

[9] The appellant was advised that, although she was returning to the Atlanta Regional Office, the SAN was still in effect. IAF, Tab 10 at 124.

5

**The charges are sustained.**

An agency must establish three things when it takes an adverse action against an employee. It must first prove by preponderant evidence that the charged conduct occurred.[10] 5 U.S.C. § 7701(e)(1)(B). It must further establish the existence of a nexus between the conduct and the efficiency of the service. 5 U.S.C. § 7513(a); *Hayes v. Department of the Navy*, 727 F.2d 1535, 1539 (Fed. Cir. 1984). Finally, the agency must demonstrate that the penalty imposed was reasonable. *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306-7 (1981).

The agency removed the appellant on two charges: Inappropriate Conduct and Failure to Follow Your Supervisor's Instructions. IAF, Tab 10 at 134-136. Both charges are supported by multiple specifications. As detailed more fully below, I find that the agency has shown that a preponderance of the evidence supports both charges.[11]

**Charge 1: Inappropriate Conduct.**

The agency's charge of inappropriate conduct was supported by three specifications as discussed more fully below. A charge of inappropriate conduct does not require a showing of specific intent. *See, e.g., Fernandez v. Department of Agriculture*, 95 M.S.P.R. 63, ¶ 7 (2003) (a general charge such as "improper conduct" does not contain a specific intent element).

**Preponderant Evidence Supports Specification A.**

Specification A of Charge 1 reads as follows:

---

[10] A preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

[11] The appellant erroneously stated that a determination had been made, at the prehearing conference, that the agency had met its burden of proof. IAF, Tab 29 at 13. It is not clear why the appellant was left with this impression when the close of record summary clearly laid out the burden of proof that the agency needed to show to prove its case in this appeal. IAF, Tab 28.

---

6

On or about December 7, 2016, I received a letter from a Disabled American Veteran (DAV) employee, Mr. Matthew Jahn. In the letter Mr. Jahn indicated that he was "filing a formal complaint" against you for "making sexual advances" towards him. The letter stated that Mr. Jahn informed you that he "was in a relationship well over a month ago" and you "claimed that [you] understood and would leave [him] alone." He stated that since then, you have repeatedly visited his desk and "continue to harass" him. Mr. Jahn also indicated that during these visits, you touched his leg and back and attempted to kiss him. The letter further provides that on December 7, 2016, you asked him, "when I get home, if I was going to think about f*****g her."

In response to the December 7, 2016 letter, a fact finding into Mr. Jahn's complaints against you was conducted. During the fact finding, Mr. Jahn reaffirmed his previous reports. During the fact finding your indicated that you "don't believe [you] did" ever kiss or attempt to kiss him, "don't recall" whether you ever spoke with him about sexual relations or body parts, and "don't recall" if you ever touched his leg on work premises.

IAF, Tab 10 at 134.

In support of this charge, the agency submitted the written letter of Mr. Jahn in which he makes the allegations set forth in this specification. *Id.* at 119. In addition, the agency submitted written notes from the fact-finding investigation where Mr. Jahn told the investigators that the appellant tried to kiss him, whisper things to him, touch his legs, and tried to kiss him. IAF, Tab 11 at 62, 125, 127. Mr. Jahn also told the investigators that he affirmed the appellant that he was in a relationship but she tried to kiss him and ended up kissing him on the neck. *Id.* at 130. A co-worker of Mr. Jahn's, Christian Cluff, stated in December 12, 2016, that Mr. Jahn occupied the cubicle directly adjacent to his and he witnessed the appellant on multiple occasions go to Mr. Jahn's cubicle. IAF, Tab 10 at 120; Tab 11 at 50. He described Mr. Jahn's interactions with the appellant as leaving Mr. Jahn "visibly upset."[12] *Id.*

---

[12] The agency also provided a statement dated December 12, 2016 from Justice Graham, Senior National Service Officer, who stated that he witnessed the appellant going to Mr.

---

7

The appellant did not specifically deny Mr. Jahn's allegations. Rather, during her investigative interview she stated that she did not recall if she tried to kiss Mr. Jahn or talk to him about sexual relations.[13] IAF, Tab 11 at 142. The appellant indicated, however, that she believed Mr. Jahn was a willing participant in the interactions between them. *Id.* The appellant stated that she was blindsided by Mr. Jahn's complaint and that he never asked her not to come back and that she believed Mr. Cluff had something to do with it.[14] IAF, Tab 11 at 133.

The agency has not explained its failure to produce sworn statements to support this charge from Mr. Jahn or other fact witnesses. I have considered their failure to do so particularly in light of my advisement to them during the close of record conference that sworn statements are entitled to more probative weight than statements that are not sworn. Nevertheless, even though not sworn, I find Mr. Jahn's complaint and statements to the investigators to be credible and probative of what occurred for several reasons. First, I find no obvious motive or benefit to be gained by Mr. Jahn, who was not an agency employee, in filing the complaint against the appellant other than to get her visits and conduct stopped. In addition, the allegations made by Mr. Jahn in his complaint were generally consistent with the statements that he made during his investigatory interview and other evidence in the record on this matter. *See Borninkhof v. Department of Justice*, 5 MSPB 150, 5 M.S.P.R. 77, 87 (1981) (listing the factors affecting the weight to be accorded to hearsay evidence). Although the appellant has

---

Jahn's desk "almost every day since she has been here." IAF, Tab 10 at 121; Tab 11 at 51.

[13] The appellant described her relationship with Mr. Jahn as "friends" and indicated that they had in-person and written communication. IAF, Tab 11 at 132.

[14] After Mr. Jahn filed his complaint against the appellant, in February 2017, she filed an Equal Employment Opportunity (EEO) complaint against Mr. Cluff making various allegations against him. IAF, Tab 10 at 235.

---

8

indicated that she believes Mr. Jahn had a motive to retaliate against her, in part because she told him she was a whistleblower, she has not explained the reasons for her belief. I find that Mr. Jahn's credibility is bolstered by the statements of his co-workers who reported the appellant's frequent visits and particularly the statement of Mr. Cluff who described Mr. Jahn as visibly upset after at least one of the appellant's visits and the appellant's own actions which show her continuing to pursue Mr. Jahn even after his complaint and the SAN was issued.

In addition, while not used to support this specification, there is other evidence in the record that supports Mr. Jahn's claims in his letter that the appellant was pursuing an unwanted relationship with him. For example, on February 15, 2017, Mr. Jahn e-mailed Sharon Key, an agency human resource liaison, to inform her that the previous day, Valentine's Day, he had received flowers and a card that he believed to be from the appellant.[15] IAF, Tab 29 at 81-85. In an e-mail dated May 2, 2017, Mr. Jahn notified Ms. Key that, on April 28, 2017, he returned from lunch to find a FedEx package on his desk which he believed to be from the appellant based on the "sticker that was used to seal the envelope . . . [which] was the same symbol that was on her sticky notes that she used to write her number on."[16] *Id.* at 88.

Although the appellant included a sworn statement with her close of record submission, she does not specifically deny the conduct set out in this specification. IAF, Tab 29 at 1-47 of 166. Rather, the appellant alleges that there were "no witnesses to Mr. Jahn's allegations." IAF, Tab 29 at 42.

---

[15] Mr. Jahn included photos of the flowers and the card which included the following message, "Love Your Smile and Sense of Style . . . Man, How You Make Me Blush Like A Child . . . Will You Be Mine – The Master Of My Heart, Body, And Desire? My Dear Valentine? Yours, Truly Yours . . . Babe." IAF, Tab 29 at 85.

[16] In that same e-mail Mr. Jahn informed Ms. Key that the appellant had shown up at his gym in early March and had asked him if he had received the Valentine's Day flowers that she had sent to him. IAF, Tab 29 at 88.

9

However, the appellant was a witness to the events and I find it particularly troubling that she failed to address Mr. Jabu's claims by either affirming or denying them in her sworn submission.[17]

The appellant has argued that this specification required the agency to prove the elements of sexual harassment. I disagree. The agency, in this specification, was merely recapping the appellant's conduct as characterized by Mr. Jabu in his written complaint. A charge of inappropriate conduct, such as the one here, does not require a showing of intent and the agency's description of the appellant's conduct through the lens of Mr. Jabu's complaint does not turn the inappropriate conduct charge into a sexual harassment charge as the appellant alleges.[18]

Based on the above, I find that a preponderance of the evidence supports this specification and it is sustained.

Preponderant Evidence Supports Specification B.

Specification B of Charge 1 stated as follows:

On or about December 6, 2016, you engaged in disrespectful, insulting and insolent behavior while your supervisor held a meeting to address the entire training class regarding the rules and behavior in the workplace. Specifically, you interrupted your supervisor as she was speaking to the class and raised your voice as you called your co-workers liars and children or words to that effect.

---

[17] In addition, based on certain statements the appellant has made on what occurred during the prehearing conference in this appeal, I seriously question her ability to accurately reflect events as they occurred. The appellant has made statements in both her closing submission and her rebuttal that are simply incorrect. IAF, Tabs 29 and 32. As previously explained, *supra* at footnote 1, the appellant completely mischaracterized my comments about the Agency File and the document index in her closing submission. She further misconstrues what took place at the conference in her rebuttal when she states that the undersigned was planning to allow the agency to resubmit its Agency File. IAF, Tab 32 at 6 of 53. To the contrary, I specifically informed the parties that I was not going to do that because I did not want to delay the proceedings in this appeal.

[18] To the extent the agency has referenced agency policies governing sexual harassment, I find they were used to show notice and the seriousness of the appellant's conduct.

---

10

informed by your supervisor and the AFGE union president that you were being inappropriate; yet, you continued to disrupt the meeting.

IAF, Tab 10 at 134.

In support of this charge, the agency submitted a summary of the meeting that was prepared by Chanzal Wynter. IAF, Tab 11 at 160-161 of 178. The summary states that the meeting was conducted to review the rules and behavior of the workplace. *Id.* at 160. According to the summary, during the meeting, the appellant began cutting off Ms. Wynter and disrupting the class. *Id.* at 161. The appellant called the class "a liar" and "children."[19] *Id.* Ms. Wynter indicated that the tension in the room was so thick at the end of the meeting that she felt it necessary to not everyone on break, but that the appellant left the room prematurely indicting that she had to use the bathroom and stated that "no one can stop her" from using it. *Id.*

Mr. Bryant, the classroom supervisor, was also present for the meeting and provided a written unsworn statement. Mr. Bryant stated that the appellant stated that everyone in the classroom "was a bunch of liars and childish when management is not around." IAF, Tab 11 at 162. According to Mr. Bryant, Mr. Foreman informed the appellant that she should not use these words to refer to her co-workers but she continued to do so even after Ms. Wynter told her that it was not appropriate for the workplace. *Id.* Mr. Bryant also indicated that the appellant refused to wait for the designated break to go to the bathroom indicating that no one could stop her from going. *Id.*

The agency also provided statements from some of the appellant's co-workers who were at the December 6, 2016 meeting. One of the co-workers, Derick Colbert, stated that the appellant was very disrespectful to Ms. Wynter

---

[19] According to the summary, Mike Foreman, a union representative present at the meeting, informed the appellant that it was inappropriate to use names such as "liar" or "children." IAF, Tab 11 at 161.

---

11

and that she had offended him.[20] Tresha Miller provided a statement where she indicated the appellant called the entire class children, refused to stop interrupting and refused to be seated during the meeting. IAF, Tab 11 at 164. In her statement, Alana De la Cruz, stated that the appellant called the class children and Ms. De la Cruz indicated that she began to have a panic attack and had to leave the classroom because of the appellant's behavior. *Id.* at 165. Lora Nichols stated that the appellant called the entire class children and interrupted Ms. Wynter during the meeting and threatened everyone in the class with "her lawyer."[21] *Id.* at 166. In his statement, Dwayne Turner supported the statements of the other meeting participants. *Id.* at 167. He also described the appellant's behavior as abrasive and bullying. *Id.* Denise Matthews described the appellant's behavior during the meeting as "impolite accusations and threats" stating that the appellant had "several rude outbursts."[22] IAF, Tab 11 at 168. Other participants at the meeting essentially corroborated this specification that the appellant interrupted her supervisor, called her classmates children or liars or words to that effect and was disruptive. *See, e.g.,* IAF, Tab 11 at 169, 170, 171, 172, 173, 174, 175, 176, 177; IAF, Tab 12 at 4, 5.

The appellant alleges that she was "set up" by the union at this meeting to protect its dues paying members. IAF, Tab 29 at 111 However, she has

---

[20] Mr. Colbert also stated that individuals in the meeting felt bad for the appellant and wanted to help her but she told them it "was too late and that she had gotten a lawyer." IAF, Tab 11 at 163. He also indicated that the appellant had created an unhappy and unsafe work environment. *Id.*

[21] Ms. Nichols indicated that the situation was so stressful for her that her hands were shaking. IAF, Tab 11 at 166. She indicated that the appellant had made the work environment stressful and hostile. *Id.*

[22] Ms. Matthews indicated that the appellant's behavior during the meeting had stressed her out to the point of getting a migraine requiring her to take sick leave for the rest of the day. IAF, Tab 11 at 168.

---

12

presented no evidence to support her speculation and I find no merit to it.[23] She has also argued that she was sandbagged and that the meeting was retaliation for a November 28, 2016, complaint that she had filed with agency management and for an EEO complaint she had filed against Ms. Miller with the IRS. IAF, Tab 10 at 152-153. The appellant argued in her closing submission that her coworkers lacked credibility and had motive to retaliate against her because they had been the subject of her complaints. IAF, Tab 29 at 43. However, the appellant has presented no evidence that at the time of the meeting in question, the other employees were aware of her November 28, 2016 complaint and her complaint did not implicate all of the individuals that provided statements.[24]

I again note the failure of the agency to explain its failure to produce sworn statements from the fact witnesses to the meeting. Giving the appellant the benefit of the doubt and discounting the statements of Ms. Miller, I still find the overwhelming weight of the evidence supports that the appellant was disrespectful and rude during the meeting and called her co-workers liars. While I recognize that none of the agency's statements are sworn, the sheer number of statements obtained and the general consistency of the statements with each other leaves little doubt what occurred on that date and outweighs the appellant's sworn contentions that she was not the one responsible for the disruption. *See Borninkhof,* 5 M.S.P.R. at 87. I find that the appellant's conduct was

---

[23] In fact, the evidence shows that some of the appellant's co-workers requested a meeting with Ms. Wynter, and further asked that their union representative be present at the meeting. IAF, Tab 11 at 16. The meeting, however, appeared to be conducted by agency management, not the union, and the appellant has presented no evidence why the union would be interested in "setting her up" as she alleges.

[24] While the agency has presented evidence that management met with certain employees to discuss issues raised by the appellant in her November 28, 2016 complaint, those meetings occurred after the December 6, 2016 meeting at issue here. *See* IAF, Tab 31 at 27-33.

13

inappropriate particularly during a meeting convened to discuss appropriate workplace behavior.

Based on the above, I find that a preponderance of the evidence supports this specification and it is sustained.

**Preponderant Evidence Supports Specification C.**

Specification C of Charge 1 stated as follows:

> On or about December 1, 2016, at approximately 10:00 AM, your supervisor witnessed your disruptive behavior in the classroom during an incident that occurred with you and your co-worker. During the incident you screamed in a loud voice at the co-worker. "If you need me to move, I can move" or words to that affect. Your outburst was such that it was disruptive to the entire classroom. Your supervisor removed you from the class in an effort to calm you down. This type of behavior is not appropriate for the workplace.

IAF, Tab 10 at 134-135.

In support of this charge, the agency submitted the statement of Ebony Brown, a Veterans Service Representative and classmate of the appellant's. IAF, Tab 12 at 6. In her statement, Ms. Brown indicated that on December 1, 2016, she brushed the back of the appellant's chair while moving to another seat. *Id.* According to Ms. Brown, the appellant "went off on me as if I pushed her chair on purpose." *Id.* Ms. Brown stated that the appellant's behavior was threatening and stated "we don't know when this lady might go off and affect or harm us all." *Id.*

The agency also provided a statement from Ms. Wynter who stated that on December 1, 2016, she witnessed the appellant speaking "in a very loud tone and shouting at Ebony saying she could have moved." IAF, Tab 12 at 8. Ms. Wynter indicated that she went over to the appellant who stated that Ebony "abused her physically by bumping her chair" and kept going on "in a loud and disruptive manner." *Id.* Ms. Wynter described the appellant as creating a scene and stated that the "class was disrupted from continuing to work on the project assigned to them." *Id.* The agency also submitted the statements of Brian McIntosh and

---

14

Glennda Dixon. *Id.* at 12, 13. Mr. McIntosh stated that the appellant had an outburst on December 1, 2016, directed at Ebony Brown. *Id.* at 12. Ms. Dixon stated that the appellant "became agitated when someone bumped her chair while passing by." *Id.* at 13.

In her written response to the proposed removal that the appellant submitted under oath, the appellant argued that Ms. Brown was the aggressor. IAF, Tab 10 at 156-157. The appellant also alleged in her close of record submission, that she did engage in the conduct with which she was charged, that she reported it to Ms. Wynter first and that Ms. Brown became irate with her when she asked her if she needed more room to pass by. IAF, Tab 29 at 114-115. While I find the appellant's version of events to be somewhat suspect, her statement was submitted under oath and it is entitled to more evidentiary weight than the agency's evidence, none of which is sworn.[25] In light of the amount of evidence the agency has produced to support this specification, the fact that it is unsworn, the appellant's sworn statement denying that she was the aggressor, I find that the agency has failed to meet its burden of proving this specification by a preponderance of the evidence. Accordingly, I find that this specification is not sustained.

Having found that a preponderance of the evidence supports Specifications 1 and 2 of Charge 1, I find that Charge 1 is SUSTAINED. *See Burroughs v. Department of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990) (where there is one charge with multiple factual specifications in support of the charge, proof of one or more, but not all, of the specifications is sufficient to sustain the charge); *Crawford-Graham v. Department of Veterans Affairs*, 99 M.S.P.R., 389, ¶ 19 (2005) (agency can meet its burden of proof on its charge by proving one specification).

---

[25] The agency has provided no explanation for not providing sworn statements.

---

15

**Charge 2: Failure to Follow Your Supervisor's Instructions**

To prove a charge of failure to follow supervisory instructions, an agency must establish that the employee (1) was given proper instructions, and (2) failed to follow the instructions, without regard to whether the failure was intentional or unintentional. *Hamilton v. U.S. Postal Service*, 71 M.S.P.R. 547, 555-56 (1996); *Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, ¶ 4 (2014). This charge was supported by two specifications discussed below.

**Preponderant Evidence Supports Specification A.**

The first specification stated as follows:

> On or about December 13, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative" in the Public Contact Team (PCT) area of the Atlanta Regional Office. The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." The SAN instructed you to contact your supervisor if there was a "business need in DAV that requires contact with Mr. Jahn." On or about December 13, 2016, you entered the PCT area at approximately 5:57:37 AM and left a typed letter and a drink on Mr. Jahn's desk.

IAF, Tab 10 at 135.

As a preliminary matter, I find that the Stay Away Notification (SAN) was a proper instruction given to the appellant. I find no merit to the appellant's allegations that the SAN was somehow unclear or ambiguous. Rather, I find that the SAN was issued by Ms. Wynter, one of the appellant's supervisors, who had the authority to direct the appellant in work related matters. Furthermore, the SAN did not require the appellant to do anything illegal or improper. Accordingly, I find no error with the SAN and I find that it was a proper instruction.[26]

---

[26] The appellant's allegation of harmful error related to the SAN will be addressed more fully below.

---

16

This specification essentially charges the appellant with violating the SAN by entering Mr. Jahn's workspace and leaving a drink and typed letter for him on December 13, 2016, the day after the SAN was issued. On that day, Mr. Jahn reported finding a drink and letter from the appellant on his desk after being briefed about the SAN. IAF, Tab 11 at 68. During the fact-finding investigation, the appellant denied knowledge of the drink and note found in Mr. Jahn's work area. IAF, Tab 11 at 61, 139, 142. However, the investigators found that the appellant's badge had been used to enter the general work area where Mr. Jahn worked on December 13, 2016, at 5:57 a.m. *Id.* At 91. The agency also provided the badge records for the appellant which reflect this. IAF, Tab 11 at 89-91.

In her close of record submission, which was submitted under oath, the appellant alleges that there are no witnesses to her placing anything on Mr. Jahn's desk. IAF, Tab 29 at 116. She also argues that the letter cannot be linked to her because it does not contain her signature and she is being "set up." However, the appellant does not deny that she left the drink and letter on Mr. Jahn's desk.

I find the evidence is sufficient to find that more likely than not the appellant left the drink and letter on Mr. Jahn's desk on December 13, 2016, in violation of the SAN. My determination is based on the following: the fact that the appellant's PIV card was recorded entering Mr. Jahn's work area during the timeframe when the drink and letter was most likely left on Mr. Jahn's desk and the content of the letter left for him. While the appellant argues the letter was designed to set her up, the letter is very detailed and contains personal details about the appellant and her conversations with Mr. Jahn that likely only she would know. IAF, Tab 11 at 54, 79. The letter also includes her home address and personal email address. *Id.* I also find it compelling that the appellant did not deny placing the note and drink on Mr. Jahn's desk in her sworn affidavit, something I believe she would have done if she did not, in fact, leave those items for Mr. Jahn. Thus, I find the appellant was not forthcoming in her sworn

17

statement where she was purposely evasive about the drink and the letter in an attempt to obfuscate the truth on this issue.

Based on the above, I find that a preponderance of the evidence supports this specification and it is sustained.

<u>Preponderant Evidence Supports Specification B.</u>

The second specification stated as follows:

On or about December 12, 2016, you were issued a Stay Away Notification (SAN) that instructed you to have "absolutely no contact or (written/verbal) communication with Mr. Matthew Jahn, a DAV Representative." The SAN further provided that violation of the instructions "may result in disciplinary or adverse action being taken against you." On December 13, 2016, Mr. Jahn reported that as he was walking back to his office from the VA Medical Center, you approached him and stated, "[we are] not in the building, so we can talk out here." When asked during the fact finding about your contact with Mr. Jahn since the issuance of the SAN, you stated that the SAN was "improperly issued," you asked for clarification, and you invoked the "5th Amendment."

IAF, Tab 10 at 135.

This specification charges the appellant with violating the SAN when she approached Mr. Jahn on December 13, 2016, as he was walking back to his office from the VA Medical Center while on the agency's campus. The appellant does not dispute that she approached Mr. Jahn on December 13, 2016, outside of the Atlanta Regional Office as alleged in this specification. Rather, in her written response to the proposal letter, she argued that the SAN was confusing because it was not clear if it applied to areas surrounding the VA Office building or contact during off duty time. IAF, Tab 10 at 158. And, in her close of record submission, which she submitted under oath, the appellant stated that she asked for clarification of the SAN and was told that it did not apply to any conduct off-

---

[29] The appellant incorrectly states in her Rebuttal that she was advised during the close of record conference that she had to show "direct" proof of a violation of law,

18

duty.[27] IAF, Tab 29 at 116-118. The appellant also argued that the area where she approached Mr. Jahn was a public sidewalk so the SAN did not apply. Id.

The evidence shows that on December 12, 2016, Mr. Jahn reported that the appellant tried to make contact with him while he was at lunch. IAF, Tab 11 at 68. Specifically, Mr. Jahn stated in a memorandum written that day that he was walking back from the hospital and the appellant "was at the bottom of the hill almost as if she was waiting for me. She approached me, said we're not in the building so we can talk out here. I didn't entertain her response; expect [sic] to reiterate there is a no contact order . She said she would leave me alone (which she has said in the past) but that was after contacting me after the no contact order was put in place." Id.

The appellant does not deny contacting Mr. Jahn, and I have already found the SAN to be an appropriate order, so the only issue is whether it applied outside of the VA building. I find that it did. The SAN clearly stated that the appellant was to have "absolutely no contact or (written/verbal) communication with Matthew Jahn." IAF, Tab 11 at 52 (emphasis in original). I find that the SAN was sufficiently clear that a reasonable person would find that it prohibited their contact with Mr. Jahn anywhere on the VA campus.[28] Clearly, Mr. Jahn understood it's applicability to the appellant under the circumstances here because he pointed out to her that she was violating the no contact order in approaching him.

Based on the above, I find a preponderance of the evidence supports this specification and it is sustained.

---

[27] During her investigative interview, the appellant refused to answer if she had contact with Mr. Jahn after the SAN was issued and invoked the 5th amendment. IAF, Tab 11 at 133.

[28] In addition, if the appellant had any doubt as to the scope of the SAN, she should have asked her supervisor for guidance before approaching Mr. Jahn.

19

Having found that a preponderance of the evidence supports specification A and specification B of Charge 2, I find that Charge 2 is SUSTAINED.

<u>The appellant did not prove her affirmative defenses.</u>

The appellant raised the following affirmative defenses: whistleblowing, due process, reprisal for prior EEO activity, harmful error, and reprisal for writing to her Congressman. IAF, Tab 27.

1. Whistleblowing

The appellant is alleging reprisal for whistleblowing based on two protected activities: (1) a complaint the appellant filed with the Board against the Department of Labor in which she raised whistleblowing, and (2) disclosures she made in a November 28, 2016 letter to the agency. IAF, Tab 27. Once the agency proves its initial case by a preponderance of the evidence, the appellant must show by a preponderance of the evidence that she made a protected disclosure under 5 U.S.C. § 2302(b)(8) or (b)(9)(A)(i) and (C), and that the disclosure was a contributing factor in the agency's personnel action. Shannon v. Department of Veterans Affairs, 121 M.S.P.R. 221, ¶ 21 (2014); Shibuya v. Department of Agriculture, 119 M.S.P.R. 537, ¶ 19 (2013); 5 C.F.R. § 1201.56(b)(2)(i)(C). If the appellant establishes a prima facie case of whistleblowing reprisal, then the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken the same personnel action absent any protected activity. Shannon, 121 M.S.P.R. 221, ¶ 22; 5 C.F.R. § 1209.4(d).

The appellant made a protected disclosure.

Protected disclosures are those that an appellant reasonably believes evidence a violation of a law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.[29] 5 U.S.C. § 2302(b)(8)(A); Chambers v. Department of

20

the Interior, 515 F.3d 1362, 1367 (Fed. Cir. 2008). A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the government evidence wrongdoing as defined by the WPEA. Lachance v. White, 174 F.3d 1378, 1381 (Fed. Cir. 1999), cert. denied, 528 U.S. 1153 (2000). "The appellant need not prove that the matter disclosed actually established one of the types of wrongdoing" as defined by the WPEA; rather, the appellant must show that the matter disclosed was one which a reasonable person in her position would believe evidenced any of the situations specified in 5 U.S.C. § 2302(b)(8). Chavez v. Department of Veterans Affairs, 120 M.S.P.R. 285, ¶ 18 (2013); Schnell v. Department of the Army, 114 M.S.P.R. 83, ¶ 9 (2010). In the case of 2302(B)(9)(a)(A)(i), the employee must show that the agency took the action at issue here in reprisal for her prior whistleblowing activity, i.e., her complaint with the Board against the Department of Labor.

The appellant alleges that she made protected disclosures in a November 28, 2016 complaint that she provided to her supervisors including Ms. Wynter.[30] IAF, Tab 13 at 25. During the close of record conference, I informed the appellant that I found the following allegations in her complaint were non-frivolous and would allow her to present evidence as part of her close of record: (1) Dwayne Turner flashed his cell phone on the appellant where his wife could

---

regulation, etc." IAF, Tab 32 at 7. The appellant's statement does not accurately state what took place during the close of record conference. IAF, Tab 29. I advised the appellant that she had the burden of showing that a disclosure constituted a violation of law, rule, or regulation and, to the extent it was not readily apparent, she should provide the law, rule or regulation that she believed had been violated.

[30] While the appellant addressed her complaint to the Office of General Counsel, she alleges that she was turned away from that office and instructed to take it to the office of the Director, Ms. Bocchicchio. IAF, Tab 29 at 44. The director's office told her to take the complaint to human resources, where Ms. Key directed her to speak to someone in her chain of command. Id. The close of record summary incorrectly identified the appellant as providing her complaint to the Office of Inspector General.

21

see the VDC Project Excel Spreadsheet on Mr. Turner's computer screen that had veteran's names and social security numbers in plain view;(2) Mr. Turner left his computer screen and login unlocked in violation of agency policy; (3) On November 21, 2016, Mr. Turner allowed a new hire to use his login information to get onto the VA computers; (4) On November 21, 2016, Tresha Miller had an electronic device plugged into a computer in violation of agency policy; and (5) allegations that Mr. Turner, Mr. Colbert, and Ms. De la Cruz were leaving the training room early. IAF, Tab 29.

The appellant pointed out in her close of record submission that on March 28, 2017, the agency issued a reprimand to Mr. Turner for inappropriate use of government equipment.[31] IAF, Tab 29 at 66-67. The reprimand was for allowing new employees to use or access a VA computer using his assigned log-in and credentials in violation of the agency's National Rules of Behavior, Appendix D. *Id.* at 66. Based on this, I find the appellant made a protected disclosure based on (3) above.

The appellant did not present evidence with respect to allegations (1), (2), (4), and (5). Accordingly, I find that the appellant's allegations, without more, fail to meet the preponderance of the evidence required to show that these allegations evidenced a violation of law, rule, or regulation.

The appellant also alleges that she knew of her whistleblower status because of her appeal filed against DOL. Specifically, the appellant alleges that the agency was collaborating with DOL, IRS, and the MSPB to retaliate against her for her status as a whistleblower and because of her ongoing litigation. I informed the appellant that I would treat this as an allegation of 5 U.S.C. § 2302 (b)(9) protected activity because she is alleging that she raised whistleblowing in a prior appeal with the Board. There is no dispute that the appellant filed a complaint with the Board against DOL and she claimed in that appeal that she

---

[31] The agency had proposed this reprimand on January 27, 2017. IAF, Tab 29 at 66.

---

22

made protected disclosures. Both parties have submitted documents from that appeal into the record in this case which indicate that it was an individual right of action appeal.[32] I find that she has satisfied this aspect of the 2302(b)(9).

*The appellant's disclosure was a contributing factor in her removal*

The appellant may show that a disclosure was a contributing factor in a personnel action through circumstantial evidence, using the knowledge/timing test, which relies on "evidence that the official taking the personnel action knew of the disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." *Grubb v. Department of Interior*, 96 M.S.P.R. 377, 386 (2004). Knowledge of a protected disclosure can be actual or constructive. *See Gergick v. General Services Administration*, 43 M.S.P.R. 651, 660-61 (1990).

The timing component of the test is satisfied where, as here, the contested personnel action took place months after the protected disclosure. *See Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, ¶ 20 (2008). In the instant case, the appellant's removal occurred less than six months after her November 28, 2016 complaint. While it is not clear form the record if the proposing official was aware of the appellant's November 28, 2016 complaint, the appellant provided a copy of it to the deciding official as part of her response to the proposed removal. Thus, I find knowledge and timing is satisfied with respect to the appellant's removal.

With respect to the appellant's Board appeal involving the DOL, the appellant broadly alleges that individuals at the agency knew she was a whistleblower because she told them and seems to assume that everyone at the

---

[32] While I have not personally reviewed the appellant's prior appeals, except to the extent necessary to address claims she has raised that are relevant to this appeal, I note that her prior appeal was docketed as a "1221" which is the type of appeal used to denote an individual right of action appeal.

---

23

Atlanta Regional Office was aware of her appeal with the Board filed against DOL. The evidence in the record shows that Ms. Key was aware of the appellant's MSPB appeal in December of 2015 when she received an email from a VA attorney asking her to provide information for a third party discovery request that had been served on the agency in the appellant's DOL appeal.[33] IAF, Tab 10 at 16-18. It is not really clear from their sworn statements the extent to which the proposing and deciding officials were aware of the appellant's appeal involving the DOL prior to her employment with the agency. Ms. Key was aware of that activity and it appears that she was involved in advising management during the proposal and decision to remove the appellant. Thus I assume, for the purposes of this decision, that the proposing and the deciding official had some knowledge of the appellant's previous appeal where she raised whistleblowing. Thus, I find the knowledge and timing is satisfied with respect to the appellant's prior Board appeal and the appellant's removal.

*The agency proved by clear and convincing evidence that it would have removed the appellant in the absence of her disclosure*

Having found the appellant has established a prima facie case of reprisal for whistleblowing, "the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure.'" *Whitmore v. Department of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012) (quoting 5 U.S.C. § 1221(e)). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. 5 C.F.R. § 1209.4(d). It "'is a high burden of proof for the Government to bear.'" *Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989)). In assessing whether an agency has met its burden, the Board looks to

---

[33] The VA attorney involved with that case was a different attorney than the agency's representative in this appeal. IAF, Tab 10 at 17-18.

---

24

such factors as: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated. *See Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). Not every factor is applicable in every case, and the determination of whether an agency has met its burden must be based on the totality of the relevant evidence. *See Whitmore*, 680 F.3d at 1368.

The first *Carr* factor is the strength of the agency's evidence. The agency's removal action was supported by two charges. Although one of the agency's specifications was not sustained, the remainder of the evidence supporting the agency's charges was quite strong. In particular, for Specification A of Charge 1, the appellant did not deny that she engaged in inappropriate conduct with Mr. Jahn, while Mr. Jahn's subsequent statements were consistent with the allegations of his complaint and supported by other witnesses' observations. Specification B of Charge 1 was supported by the statements of 18 of the appellant's co-workers. Even discounting the statements of those employees the appellant alleges were implicated by her November 28, 2016 complaint, the remaining evidence still strongly supports the agency's charge that the appellant acted inappropriately on the date in question. With respect to Charge 2, as discussed above, the evidence strongly supports that the appellant disobeyed the SAN on the dates in question. Specifically, the appellant's failure to deny that she placed the drink and letter, containing personal information, on Mr. Jahn's desk combined with her admission that she approached Mr. Jahn outside of the VA facilities as charged in Specification B leads to the firm belief that the appellant committed the misconduct as charged.

The second *Carr* factor, the strength and existence of a motive to retaliate, weighs in favor of the agency. With respect to the appellant's appeal involving the DOL, the proposing official does not indicate in his sworn statement that he

25

was aware of this appeal, while the deciding official states that he had no motive to retaliate against the appellant because of it. IAF, Tab 30 at 18-21, 24. I find the motive for no official of one agency to retaliate against an employee because of an appeal they had while working at another federal agency is not strong. With respect to the appellant's disclosure that Mr. Turner allowed a new hire to use his login information to get onto the VA computers, the agency investigated this allegation and took action (the aforementioned reprimand issued to Mr. Tuner) to ensure the violation did not reoccur. Thus, I find little motive for the proposing and deciding officials to retaliate where, as here, the disclosure involved a relatively minor violation that was quickly remedied by the agency and did not directly impact either official. I also find that the appellant's disclosure was not the type that implicated higher level leadership by casting the agency in a bad light generally. *See Phillips v. Department of Transportation,* 113 M.S.P.R. 73, ¶ 23 (2010) (finding that comments generally critical of the agency's leadership would reflect poorly on officials responsible for monitoring the performance of the field staff and making sure that agency regulations are carried out correctly and consistently); *Whitmore,* 680 F.3d at 1370-71 (the appellant's criticisms cast the agency, and by implication all of the responsible officials, in a highly critical light by calling into question the propriety and honesty of their official conduct); *Chambers v. Department of the Interior,* 116 M.S.P.R. 17, ¶ 69 (2011) (finding motive to retaliate because the appellant's disclosures reflected on the responsible agency officials as representatives of the general institutional interests of the agency). Thus, I find the proposing and the deciding officials had little motive to retaliate against the appellant for either her November 28, 2016 disclosure or her prior Board appeal involving the DOL.

With respect to the third *Carr* factor, the agency has alleged that there are no similarly situated individuals and therefore argues that this factor is not relevant. IAF, Tab 30; *Carr,* 185 F.3d at 1323. Although the appellant has argued that other employees have engaged in misconduct and were not

26

disciplined, she has not identified any employees who were similarly situated to her, that is, charged with both inappropriate conduct and failure to follow a supervisor's instructions. In the absence of evidence to support this *Carr* factor, it is removed from the analysis. *Whitmore,* 680 F.3d at 1374; *see Runstrom v. Department of Veterans Affairs,* 123 M.S.P.R. 169, ¶ 18 (2016) (finding that, due to lack of evidence that there were any employees similarly situated to the appellant, the third *Carr* factor was not significant for the analysis of that case). Based on the above, I find this factor is not relevant here.

Weighing the remaining relevant *Carr* factors together, I find that, given the strength of the agency's evidence regarding its reason for removing the appellant and the absence of a motive to retaliate on the part of the proposing and deciding officials, the agency demonstrated by clear and convincing evidence that it would have removed the appellant even absent her protected disclosure. Accordingly, I find the appellant has failed to establish her affirmative defense of reprisal for whistleblowing.

**2. Due Process**

The appellant has also alleged that the deciding official did not consider her response and that all of the evidence relied upon to support the proposed removal was not provided to her. Failure to consider an employee's response and failure to provide the evidence relied upon to support the charges against an employee can give rise to a due process violation. The appellant has also alleged that the agency denied her "the opportunity to obtain favorable evidence" from DAV or other agency employees and that this also constituted a due process violation. IAF, Tab 1.

In support of her argument that the agency relied upon material not provided to her, the appellant pointed to emails and photographs that she alleged were sent to Ms. Key, the agency's human resources liaison that had not been provided to her. IAF, Tab 29 at 26. The appellant argued that the agency had

27

this information in its possession before it removed her but did not produce it until this appeal was filed and she asked for it in discovery. *Id.* at 26. She also alleged that the agency used her "improper deposition" as a basis for collecting inadmissible evidence though she did not elaborate as to why the deposition was improper, or how questions asked after the action was taken could be used as the basis for a decision that had already been made. *Id.*

In response, the agency provided a sworn declaration from the deciding official, Mr. Bocchicchio. IAF, Tab 30 at 23, ¶ 6. In his declaration, the deciding official stated that he considered the appellant's written response to the proposal letter. *Id.* at ¶ 6. *Id.* He also stated that he did not consider anything other than the appellant's response and the evidence file when making the decision to remove her. *Id.* at 23, ¶¶11-12. Also included in the appeal file is a February 10, 2017, e-mail sent from the appellant to Ms. Key where she requested the material relied upon to support the removal action. IAF, Tab 10 at 117-118. Ms. Key responded to the appellant's email that same day informing her that the evidence file had already been provided to her. *Id.* Although the appellant's email sought additional documentation, Ms. Key noted that information was not relied upon by management in proposing the action. *Id.* I agree with Ms. Key that the other information sought by the appellant in her February 10, 2017 email amounted to a request for discovery that the agency was not required to provide.

With respect to the information the appellant sought to obtain from DAV, it has already been addressed through discovery in the context of this appeal. However, there is no evidence that the agency relied on information from DAV that was not provided to the appellant as she seems to be alleging.[54] Finally,

[54] In addition, while the appellant has repeatedly complained about her inability to obtain discovery from the DAV, there is no evidence that she sought to depose Mr. Jahn, a critical witness to some of the allegations in this appeal.

28

while the appellant alleges that the deciding official had communications with Mr. Jahn, she does not specify the content of those discussions or when they took place. IAF, Tab 29 at 30. Thus, I find her allegations lack the specificity required to rise to the level of a due process violation.

Based on the above, I find the appellant has failed to show by a preponderance of the evidence that her due process rights were violated Accordingly, I find the appellant has failed to prove this affirmative defense.

**3. Harmful Error**

To prove harmful error, the appellant must show that the agency made an error in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 C.F.R. § 1201.4(r). The burden is upon the appellant to show that the error was harmful, *i.e.,* that it caused substantial harm or prejudice to her rights. *Id.*

The appellant stated in her appeal that she was alleging harmful error based on the agency not complying with the parties' collective bargaining agreement but she failed to specify the specific provisions of the agreement she alleged the agency failed to follow. During the prehearing conference, she was unable to articulate the specific contractual provisions. IAF, Tab 27. As a result, I provided her an opportunity to supplement the record by providing the specific procedures or contract provisions that served as the basis for this affirmative defense no later than August 7, 2017. *Id.* The appellant submitted a document detailing her harmful error claims.

*Article 14, Section 5 – Alternative and Progressive Discipline*

This section of the parties' collective bargaining agreement states, "The parties agree to a concept of alternative discipline which shall be a subject for local negotiations. The parties also agree to the concept of progressive discipline, which is discipline designed primarily to correct and improve employee behavior, rather than punish." IAF, Tab 28 at 79 of 85.

29

The appellant argues that the agency did not comply with this provision when it removed her from her position. The agency argues that this provision of the collective bargaining agreement is goal oriented rather than subscribing a specific requirement that must be followed. IAF, Tab 30; *see Stevens v. Department of the Air Force*, 395 Fed. Appx. 679, 682 (Fed. Cir. 2010). I agree and find that this provision is housekeeping in nature and is not judicially enforceable. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1357 (Fed. Cir. 2005); *Stevens*, 395 Fed. Appx. at 682. Regardless, even if I were to find that this section of the collective bargaining agreement was substantive, the appellant has failed to show that the agency failed to follow it with respect to the misconduct at issue in this case or that any error was harmful to her.[35]

### Article 14, Section 10 – Investigation of Disciplinary Actions, Paragraph B

This provision of the collective bargaining agreement states:

> Disciplinary investigations will be conducted fairly and impartially, and a reasonable effort will be made to reconcile conflicting statements by developing additional evidence. In all cases, the information obtained will be documented. Supervisory notes may be used to support an action detrimental to an employee only when the notes have been shown to the employee in a timely manner after the occurrence of the act and a copy provided to an employee as provided for in Article 24 – Official Records.

IAF, Tab 28 at 81.

The appellant argues that she was not given supervisory notes relating to Specifications A and B of Charge 2. IAF, Tab 29 at 36-37. The appellant's supervisor's notes were used to support these specifications. IAF, Tab 26. I disagree with the agency that this section constitutes a contractual goal like Article 14, Section 5 above. Rather, this section seems intended to allow an employee to see documentation prepared by supervisors that concerns them before those documents are used to support a disciplinary action. Because the

---
[35] *See* penalty discussion penalty, *infra*.

---

30

agency did not do this. I find that the agency erred in not providing the appellant with the supervisory notes from the December 1 and 6, 2016 meetings before using them as part of the action at issue here.

I find, however, that the appellant has failed to show, by preponderant evidence, that this error was harmful because she has failed to show that she was harmed by the delay in receiving the supervisory notes where she received them as part of the proposed removal package, and was given an opportunity to respond before the deciding official made the decision to remove her. Accordingly, I find she has failed to show harmful error in the agency's delay in providing the supervisory notes to her.

### Article 17, Section 12 – Improper Orders

This section of the collective bargaining agreement states as follows:

> An employee has the right to question an improper order that would direct him/her to act outside the scope of practice, privileges, competencies, or qualifications. The employee will promptly bring his/her concerns about the improper order to an appropriate supervisor. The supervisor will promptly apprise the employee whether the order was proper or improper. A refusal to obey an improper order will not subject the employee to disciplinary or adverse action or major adverse action.

IAF, Tab 28 at 82-83 of 85.

The appellant alleges that the SAN was "improper and conflicting." IAF, Tab 29 at 39. In support of her position, the appellant argues that the SAN was only issued to her and not to Mr. Jahn, and that the issuance of the SAN indicated that the agency had essentially made up its mind about the validity of Mr. Jahn's complaint before conducting an investigation. *Id.* The appellant also argues that she asked Ms. Wynter to clarify the SAN because it did not specifically state that it included the areas within proximity of the agency's facilities. According to the appellant, the agency modified the SAN to include this clarification and also the statement "regardless of duty hours" on December 16, 2016. *Id.*

---

31

The agency argued that this section of the contract does not apply to the SAN because this section of the contract was intended to apply to orders relating to professional responsibilities. IAF, Tab 31. The agency also argues that this provision does not apply because it did not direct the appellant to act outside the "scope of practice, privileges, competencies, or qualifications" and there is no evidence that the SAN contained conflicting orders or that the appellant brought it to the attention of a supervisor as required by this section. IAF, Tab 30.

I have already found the SAN to be a proper instruction and further found that it was unambiguous and clear on its face. I further find that the appellant has failed to show that this section applies to the SAN because the SAN does not involve an order that requires her to "act outside the scope of practice, privileges, competencies, or qualifications." Thus, I agree with the agency that this contract provision does not apply. And, assuming the appellant did find it confusing as she asserts, I find that she has not shown that she promptly brought her concerns to the attention of her supervisor as this contract provision requires. Accordingly, I find that the appellant has failed to show any error with respect to this section of the contract.

### Article 17, Section 13 – Conflicting Orders

This section of the collective bargaining agreement states:

> When an employee receives conflicting orders, he/she will bring the conflict to the attention of the supervisor who gave the last order or another appropriate supervisor. The employee will be given a clarified order. The employee will not be subject to disciplinary, major adverse or adverse action for following the clarified order.

IAF, Tab 28 at 82-83 of 85.

Although the appellant raised this section of the collective bargaining agreement, she has not adequately explained how the SAN conflicted with any other order that she allegedly received. Because I find that there is no evidence that the appellant received conflicting orders or brought them to the attention of

---

32

her supervisor, I find she has failed to establish any error with respect to this provision of the collective bargaining agreement.

Based on the above, I find the appellant has failed to prove her harmful error affirmative defense by a preponderance of the evidence.

**4.  Reprisal for Prior EEO Activity**

The appellant also alleges that the agency's removal of her was taken in reprisal for an EEO activity. Federal employees are protected against retaliation for the exercise of Title VII right, by 42 U.S.C. § 2000e-16. *Savage v. Department of the Army*, 122 M.S.P.R. 612 ¶¶ 36, 37 (2015). The Board has held that a violation is established where the appellant shows that retaliation "was a motivating factor in the contested personnel action, even if it was not the only reason." *Id.*, ¶ 41.

The appellant may meet her burden to establish a violation of 42 U.S.C. § 2000e-16 in several ways. One way is by introducing direct evidence of discrimination or retaliation. *Id.*, ¶ 42. Direct evidence of discrimination may be any statement made by an employer that: (1) reflects directly the alleged discriminatory attitude and (2) bears directly on the contested employment discrimination. *Arredondo v. U.S. Postal Service*, 85 M.S.P.R. 113, ¶ 13 (2000).

The appellant may also meet her burden through circumstantial evidence. Circumstantial evidence is evidence that may support an inference that retaliation was a motivating factor in an employment action. The Board has identified three types of circumstantial evidence. The first kind "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Savage*, 122 M.S.P.R. 612, ¶ 42, *quoting* *Troupe v. May Department Stores Company*, 20 F.3d 734 (7th Cir. 1994). Considered together, such bits and pieces may compose "a convincing mosaic of discrimination." *Id.* at 736-737. Second is comparator evidence,

33

consisting of "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Id.* Third is evidence that the agency's stated reason for its action is "unworthy of belief, a mere pretext for discrimination." *Id.* "Each type of evidence," the court explained, "is sufficient by itself . . . to support a judgment for [the employee]; they can be used together." *Id.*

Thus, the Board will first examine the record to determine if the appellant has shown by a preponderance of the evidence that the prohibited consideration was a motivating factor in the contested personnel action. As stated, the evidence may consist of any of the four types discussed above, alone or in combination. If she has made such a showing, the Board will find that the agency committed a prohibited personnel practice in violation of 5 U.S.C. § 2302(b)(1). If she has not made such a showing, the inquiry will end at that point.

Here, as with most appeals of adverse actions taken under 5 U.S.C., chapter 75, the agency has already articulated a non-discriminatory reason for its action, i.e., the charged misconduct. Accordingly, the agency has done everything that would be required of it if the appellant had made out a prima facie case, and whether she in fact did so is no longer relevant. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Where an appeal has gone to a hearing and/or the evidentiary record is complete, the inquiry for reprisal proceeds to the ultimate question, which is whether, upon weighing the evidence presented, the appellant has met her overall burden. *See Berry v. Department of Commerce*, 105 M.S.P.R. 596, 600-01 (2007).

The appellant alleges the agency retaliated against her on the basis of an EEO complaint that the appellant filed with the IRS against Tresha Miller.[36] IAF.

---

[36] Ms. Miller, who works at the agency as a Veterans Service Representative, previously worked with the appellant at the IRS

---

34

Tab 10 at 211-218. That complaint was filed with the IRS on November 16, 2016. *Id.* IAF, Tab 29 at 21. In his sworn statement, the proposing official stated that he was aware that the appellant was engaged in previous litigation with Ms. Miller while they were employees at the IRS but did not know the details of the litigation. IAF, Tab 30 at 20. The proposing official stated that he proposed the appellant's removal based on the evidence file and did not retaliate against the appellant based on that EEO complaint involving Ms. Miller. *Id.* The deciding official stated that the appellant told him about her EEO activity in her response to the proposed removal and he was not aware of it until then. IAF, Tab 30 at 24, ¶ 17-18. He further stated that his decision to remove the appellant was not related to this activity but relied on the evidence in the Evidence File. *Id.* at ¶ 19.

Based on the above, I find the appellant has shown that she engaged in protected activity by filing a complaint with the IRS involving Ms. Miller. I find it unclear from the proposing official's statement if he was aware of the appellant's current complaint against Ms. Miller or some previous one. However, the deciding official was aware of her protected activity because the appellant made a point of mentioning it in her response to the proposed removal. Assuming, *arguendo*, that the proposing official was also aware of the appellant's complaint, I find that the appellant has failed to show by preponderant evidence that her EEO complaint against Ms. Miller with the IRS was a motivating factor in the agency's decision to remove her. The appellant has presented no evidence – other than asserting knowledge of her activity – to show that her removal was taken in retaliation for her EEO activity involving Ms. Miller. And, without any evidence to support a motive, I find no motive for VA officials to retaliate against the appellant for filing an EEO complaint with another Federal agency.

The appellant has also alleged reprisal for EEO activity at the VA. Although this activity was not identified by the appellant during the close of record conference, the appellant raised this in her close of record submission.

---

35

According to agency records, the appellant initiated EEO counseling on January 5, 2017. IAF, Tab 10 at 11. On February 2, 2017, the appellant also filed an informal EEO complaint alleging that Christian Cluff, a DAV employee, was creating a hostile work environment by using his Facebook account to promote "hate speech, racist, discriminatory, and offensive views/beliefs/materials about Muslims, African Americans, Hispanics, etc." IAF, Tab 10 at 235. However, the appellant has presented no evidence that the proposing official was aware of this protected activity prior to proposing her removal. *See* IAF, Tab 30 at 20 (Declaration of Patrick Zondervan) and 24 (Declaration of A. Bocchicchio). Thus, I find she had failed to establish a prima facie case of retaliation with respect to these complaints.[37]

The appellant has argued that her informal complaint filed with the IRS involving Ms. Miller formed the seed for a "growing hostile working environment" that was used by the agency to turn her coworkers against her. IAF, Tab 29 at 20 of 166. However, other than taking issue with her co-workers statements supporting the charges against her and her issues with Ms. Miller, the appellant has failed to present sufficient evidence with respect to this claim.

### 5. Reprisal for Writing to Her Congressman

During the prehearing conference, the appellant indicated that she was alleging reprisal for writing to one of her congressman. IAF, Tab 27. I indicated that I did not believe this was an affirmative defense without more specifics, *i.e.*,

---

[37] The appellant also contacted an EEO counselor to complain about discrimination and reprisal at the VA. IAF, Tab 29 at 68-71. However, the appellant's initial contact with the EEO counselor on this complaint did not occur until May 12, 2017, after the decision to remove the appellant had already been made. *Id.* at 68. Similarly, although the appellant alleged that the agency removed her on the date she filed her complaint against Mr. Cluff, she has failed to present evidence that the deciding official or anyone outside of the EEO office was aware of the filing of her complaint on that day. IAF, Tab 29 at 21.

---

36

that whistleblowing disclosures were made in the letter. *Id.* However, I told the appellant she could address this in her close of record submissions. *Id.*

The appellant has submitted evidence that she wrote to two congressmen, Barry Loudermilk, on December 22, 2016.[38] IAF, Tab 1. In order for an appellant to prevail on a contention of illegal retaliation, she has the burden of showing that: (1) A protected disclosure was made; (2) the accused official knew of the disclosure; (3) the adverse action could, under the circumstances, have been retaliation; and (4) there was a genuine nexus between the alleged retaliation and the adverse action.

The appellant submitted a sworn statement that, on December 22, 2016, she hand delivered a letter to Congressman Loudermilk. IAF, Tab 32 at 9-10. She further stated that on January 9, 2017, Camille Revels contacted her and told her the agency had been contacted.[39] In his sworn declaration, Mr. Zondervan stated that he was not aware of the appellant's communication with her congressman until after he had proposed her removal from the agency. IAF, Tab 30 at 20. As indicated, previously, a sworn statement is entitled to great weight. Thus, I credit the proposing official's statement that he was not aware of the letter that the appellant wrote to Congressman Loudermilk at the time that he proposed her removal from the agency.

The deciding official did not specifically address the appellant's letter to Congressman Loudermilk in his sworn declaration but stated that he did not object to employees reaching "out to their congressional leaders as they see fit."

---

[38] Although the appellant presented evidence in her initial appeal of letters to several senators – Chuck Grassley, Johnny Isakson and Ron Johnson – she failed to address these letters in her further submissions. Thus, these letters will not be further discussed in this decision.

[39] Ms. Revels is a staffer in Congressman Loudermilk's office. IAF, Tab 32 at 28.

37

IAF, Tab 30 at 24, ¶20.   He further stated that the removal was based on the serious charges in the evidence file and not any alleged contact she may have had with her congressman. *Id.* at 21-22

Given the evidence supporting the appellant's removal and the relatively routine nature of the appellant's letter to her congressmen, I find her allegations that the agency knew of her letter, standing alone, are insufficient to meet her burden of showing by a preponderance of the evidence that reprisal was a factor in the decision to remove.

### There is nexus between the appellant's misconduct and the efficiency of the service.

An agency may establish nexus by showing that the employee's conduct (1) affected his or his coworkers' job performance; (2) affected management's trust and confidence in the employee's job performance; or (3) interfered with or adversely affected the agency's mission. *Johnson v. Department of Health & Human Services*, 86 M.S.P.R. 501, ¶ 1 (2000), *aff'd*, 18 Fed.Appx. 837 (Fed. Cir. 2001), *aff'd sub nom.*, *Delong v. Department of Health & Human Services*, 264 F.3d 1334 (Fed. Cir. 2001).

At the prehearing conference, I informed the parties that due to the nature of the charges at issue, if they agency proved the charges by a preponderance of the evidence, then nexus would also be established. IAF, Tab 27. In addition, the appellant's misconduct occurred at work.   And, I find the appellant's misconduct, and specifically her failure to follow the instructions of her supervisor directly interfered with the agency's ability to operate efficiently and effectively.  Accordingly, I find that there is nexus between the charge and the efficiency of the service.

### The agency's penalty is within the tolerable limits of reasonableness.

When all of the agency's charges are sustained, as is the case here, but some of the underlying specifications are not sustained, the agency's penalty

38

determination is entitled to deference and should be reviewed only to determine whether it is within the parameters of reasonableness.  *Groeber v. U.S. Postal Service*, 84 M.S.P.R. 646, ¶ 14 (2000), *aff'd*, 13 Fed. Appx. 973 (Fed. Cir. 2001); *Payne v. U.S. Postal Service*, 72 M.S.P.R. 646, 650 (1996).  In applying this standard, the Board must take into consideration the failure of the agency to sustain all of its supporting specifications.  *Payne*, 72 M.S.P.R. at 651. That failure may require, or contribute to, a finding that the agency's penalty is not reasonable.  *Laniewicz v. Department of Veterans Affairs*, 83 M.S.P.R. 477, ¶ 9 (1999). In such a case, the Board will look for evidence showing that the agency would have imposed the same penalty for the sustained specification.  *Id.*

Nevertheless, the Board's function is not to displace management's responsibility or to decide what penalty it would impose, but to assure that management's judgment has been properly exercised and that the penalty selected by the agency does not exceed the maximum limits of reasonableness.  *Alberto v. Department of Veterans Affairs*, 98 M.S.P.R. 50, ¶ 7 (2004), *aff'd*, No. 05–3090, 2005 WL 1368150 (Fed. Cir. June 10, 2005).  Thus, the Board will modify a penalty only when it finds that the agency failed to weigh the relevant factors or that the penalty the agency imposed clearly exceeded the bounds of reasonableness. *Dunn v. Department of the Air Force*, 96 M.S.P.R. 166, ¶ 10 (2004).  If the agency's penalty is beyond the bounds of reasonableness, the Board will mitigate only to the extent necessary to bring it within the parameters of reasonableness. *Id.*; *Groeber*, 84 M.S.P.R. 646, ¶ 14; *Payne*, 72 M.S.P.R. at 650–51.

If the deciding official failed to appropriately consider the relevant factors, the Board need not defer to the agency's penalty determination. *Stahlmacher*, 89 M.S.P.R. 272, ¶ 20; *Omites v. U.S. Postal Service*, 87 M.S.P.R. 223, ¶¶ 10–11 (2000); *Wynne v. Department of Veterans Affairs*, 75 M.S.P.R. 127, 134 (1997). And, if the Board finds the agency's original penalty to be too severe, it may mitigate it to the maximum reasonable penalty. *Lachance v. Devall*, 178 F.3d

39

1246, 1260 (Fed. Cir. 1999).  The Board may also mitigate to the maximum reasonable penalty when the deciding official failed to demonstrate that he considered any specific, relevant mitigating factors before deciding upon the penalty. *See Cunningham v. U.S. Postal Service*, 109 M.S.P.R. 402, ¶ 24 (2008). In addition, while the Board has held that the nature and seriousness of the offense and its effect on the individual's trustworthiness is one of the most important factors to be considered, it has also found that the seriousness of the offense is not necessarily sufficient to outweigh the other *Douglas* factors. *See Edwards v. U.S. Postal Service*, 116 M.S.P.R. 173, ¶ 14 (2010); *Omites v. United States Postal Service*, 87 M.S.P.R. 223, ¶ 10.

In his decision letter, the deciding official indicated that he considered the relevant *Douglas* factors.  IAF, Tab 10 at 130-131.  The deciding official indicated that the penalty was consistent with the Table of Penalties, and consistent with that imposed on other employees charged with similar misconduct.  *Id.*  In addition, he found that the misconduct was serious and egregious in nature impacting management's trust and confidence. *Id.* at 131.

Further, the deciding official indicated that while he considered mitigating factors raised by the appellant, he found they were not enough to lessen the penalty due to the seriousness of her misconduct.[40]  IAF, Tab 10 at 130.  The deciding official further found that the appellant's potential for rehabilitation was not evident based on her failure to adhere to ethical standards of conduct and her lack of remorse. *Id.* at 131.

---

[40] The appellant argues that the deciding official should have considered the "mounting tensious between her and her coworkers" as a mitigating factor."  IAF, Tab 29 at 46. To the extent there was tension between the appellant and her coworkers, it appears to be largely self-created by the appellant. Thus, I find it does not warrant consideration as a mitigating factor.

40

In his sworn declaration given as part of the agency's close of record submissions, the deciding official stated that he reviewed the *Douglas* factors and the appellant's response to the proposal. IAF, Tab 109 at 23, ¶7-10. He indicated that he did not find any mitigating circumstances and found that removal is supported based on any one of the charges proposed. *Id.*

Having sustained the charges, I find no basis to disturb the penalty imposed by the agency because I find the deciding official properly considered the relevant *Douglas* factors and the penalty does not exceed the bounds of reasonableness.  I find no merit to the appellant's argument that the deciding official failed to properly consider comparators because the appellant has not shown that those individuals were in fact proper comparators. *See* IAF, Tab 29 at 121; Tab 32 at 37-39.

Based on the above, the agency's removal decision is AFFIRMED.

### DECISION
The agency's action is AFFIRMED.

FOR THE BOARD:                        /S/
                                   Sharon J. Pomeranz
                                   Administrative Judge

### NOTICE TO APPELLANT
This initial decision will become final on **December 6, 2017**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the

41

date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW,
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1200.5(a), and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

**NOTICE OF LACK OF QUORUM**

The Merit Systems Protection Board ordinarily is composed of three members. 5 U.S.C. § 1201, but currently only one member is in place.  Because a majority vote of the Board is required to decide a case. *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time.  *See* 5 U.S.C. § 1203.  Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least one

42

additional member is appointed by the President and confirmed by the Senate.  The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

**Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To

43

constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your

44

burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**NOTICE TO AGENCY/INTERVENOR**

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

**NOTICE OF APPEAL RIGHTS**

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the

45

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

46

**(2) Judicial or EEOC review of cases involving a claim of discrimination.** This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (not the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); see Perry v. Merit Systems Protection Board, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. See 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

---

47

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012.** This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The

---

48

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

# Exhibit
# E

NOTE: This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

THASHA A. BOYD,
*Petitioner*

v.

DEPARTMENT OF VETERANS AFFAIRS,
*Respondent*

2018-1459

Petition for review of the Merit Systems Protection Board in No. AT-0752-17-0412-I-1.

ON PETITION FOR PANEL REHEARING AND REHEARING EN BANC

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges.*

PER CURIAM.

## ORDER

Petitioner Thasha A. Boyd filed a combined petition for panel rehearing and rehearing en banc. The petition was referred to the panel that heard the appeal, and

---

2                                                                BOYD v. DVA

thereafter the petition for rehearing en banc was referred to the circuit judges who are in regular active service.

Upon consideration thereof,

IT IS ORDERED THAT:

The petition for panel rehearing is denied.

The petition for rehearing en banc is denied.

The mandate of the court will issue on September 13, 2018.

FOR THE COURT

September 6, 2018            /s/Peter R. Marksteiner
Date                        Peter R. Marksteiner
                            Clerk of Court

# Exhibit F

rescinded and a new notice of proposed action issued. The notice will include a new advance notice period and another opportunity to reply orally or in writing, or both orally and in writing. If additional evidence becomes available to further support the charges in the advance notice, but does not necessarily provide a basis to alter the charges or the proposed penalty, the employee will be afforded the opportunity to respond to the new evidence before a final decision is made.

f. Officials involved in taking an adverse action against an employee should be aware of the prohibitions against improper "ex parte communications." The MSPB has held that agency officials may communicate with each other during the decision making process. However, it is improper for an interested party (e.g. supervisor, proposing official), to pressure the decision official into making an adverse decision. Such communications are improper, and might support reversal of the action on appeal.

## 13. DECISION NOTICE

a. The decision letter will be dated and signed by the appropriate decision official and will be delivered to the employee prior to the effective date of the action.

b. Before being issued to the employee, the notice will be reviewed by the Human Resources Management Officer, or designee, for compliance with the procedural requirements of existing statutes, OPM regulations, MSPB decisions, applicable labor-management agreements and VA policies. Any comments the Human Resources Management office may have concerning the merits of the case and any mitigating factors will be presented to the decision official.

c. The letter of decision will contain the following information (appendix F of this part):

(1) A statement that consideration has been given to all evidence developed, including the employee's reply. A written reply made by a representative in behalf of the employee is considered to be an employee's reply. If the employee replies both orally and in writing, both must be mentioned. The decision official should also make a statement regarding consideration that was given to the "Douglas" factors (see sample letter in appendix F of this part, for suggested language).

(2) A statement of the decision official's determinations regarding what reasons, If any, in the advance notice were sustained and what reasons, if any, were not sustained.

(3) If a record of prior disciplinary actions was cited in the advance notice, a statement that the action takes the past record, as cited in advance notice, into consideration in determining proper action.

(4) A statement of the effective date, if the penalty imposed is a demotion or removal; or the inclusive dates, If the penalty is a suspension.

(5) A statement concerning the employee's appeal rights, including the right to file a complaint of discrimination (if appropriate), a grievance under the negotiated grievance procedure (if applicable) or an appeal to the appropriate MSPB Regional Office. Only one of the above options may be elected. An employee shall be deemed to have made an election to raise a matter under one of the procedures when the employee timely files an appeal with the MSPB, files a formal complaint of discrimination

Case 1:18-cv-04529-MLB    Document 1    Filed 09/28/18    Page 57 of 57

**NOTE:** *For further information relating to medical documentation and medical determinations, see 5 CFR, part 339 and VA Handbook 5019. For additional information on disability and reasonable accommodation considerations, see 29 CFR 1614.203.*

(4) When the employee raises a drug or alcohol problem, management will, if appropriate, refer the individual to the Employee Assistance Program. VA Handbook 5019, Occupational Health Services, and chapter one, paragraph 8, of part I of this handbook contain guidance on this program.

(5) When an employee raises a medical condition during the advance notice period but fails to provide supporting evidence, or to submit medical evidence after being given an opportunity to do so, the decision official will base the final decision on the reasons in the notice of proposed adverse action. This is also true when it is determined by VA medical authorities that, despite medical evidence submitted by the employee, there is no causal relationship between the employee's medical condition and the reasons for the proposed adverse action.

(6) In any case where an employee raises a medical condition and is eligible for disability retirement, the employee will be counseled regarding disability retirement application procedures. However, an employee's application need not preclude or delay the final decision on the proposed action.

## 12. ARRIVING AT FINAL DECISION ON THE PROPOSED ADVERSE ACTION

a. The decision on a proposed action should be made by an official who is in a higher position than the official who proposed the action. In all cases, it is essential that consideration be given to the requirement that the employee be given an opportunity to reply and to have that reply considered before the final decision is made.

b. The decision official will give full and impartial consideration to the employee's reply(ies), if any, and all evidence of record. If the decision official sustains one or more reasons in the advance notice, he or she will give consideration to the table of examples of offenses and penalties in appendix A of this part in determining the appropriate penalty. The decision official will also carefully consider those issues discussed in paragraph 6 of this chapter regarding the burden of proof which must be met in order to sustain the adverse action on appeal.

c. In arriving at the decision, the decision official must not consider any reasons for action other than the reasons stated in the notice of proposed action. If none of the reasons are sustained, either in whole or in part, no penalty may be imposed, regardless of any past record cited in the notice.

d. The penalty may not be more severe than that proposed in the notice of proposed adverse action. It can, however, be less severe.

e. If the notice of proposed adverse action is determined to be procedurally defective so as to result in harmful error (i.e. error in the application of these procedures which, in the absence or correction of the error, might have caused management to reach a conclusion different than the one reached) or if it is found that additional reasons other than those set forth should be considered or that the appropriate penalty should be more severe than that proposed, the notice of proposed adverse action will be